66 S.E.2d 483 (1951)
191 Va. 653
MULLINS et al.
v.
STURGILL et al.
Supreme Court of Appeals of Virginia.
September 5, 1951.
*484 *485 S. H. & Geo. C. Sutherland, B. F. Sutherland and D. M. Crabtree, all of Clintwood, for plaintiffs in error.
Greear, Bowen, Mullins & Winston, Norton, for defendants in error.
Before HUDGINS, C. J., and EGGLSTON, BUCHANAN, MILLER and WHITTLE, JJ.
HUDGINS, Chief Justice.
On March 29, 1948, for a royalty of 20¢ per ton, payable monthly, Mary E. Riner leased to Joe Leedy and Virgil C. Wilfong "all the coal contained in that certain tract" of land owned by her and lying in Wise County, Virginia. The lease, among other things, provided that if the mining and removal of the coal from the leased premises should be discontinued for a period of thirty days the lease should terminate and be void, but that this provision should not apply in the event of disruption of mining operations "due to labor disputes, strikes and other work shut-downs." On termination, expiration or cancellation of the lease the lessees were given ninety days in which "to remove all their equipment, mining machinery and other such articles or merchandise" from the premises.
Leedy and Wilfong agreed between themselves to divide the leased land, Wilfong agreeing to mine the coal on that part of the land lying on the right going up a certain described stream running through the premises, and Leedy to mine that part of the coal lying on the left of the stream.
On May 27, 1948, Leedy, in consideration of a royalty of 20¢ per ton, payable to Riner, and a royalty of 20¢ per ton and a minimum sum of $25 per month, payable to him, subleased his mining rights in the land lying on the left hand side of the stream to H. D. Martin and H. J. Crabtree. These sublessees were women with no experience in mining operations. However, they authorized J. H. Martin, husband of one of the sublessees, to exercise their rights under the sublease. Martin entered upon the premises, built tipples and faced up the entries to the openings to the seam, after which he made a verbal contract with John Wesley Mullins and Tivis Browning, whereby the latter agreed to operate the mine, using their own equipment, mining machinery etc., in consideration of which they agreed to pay the royalties stated in the sublease and to divide with Martin the net proceeds accruing from the sale of coal mined on the premises. They began mining operations in June and continued through July, 1948, during which time they paid all the royalties and all expenses of operation. No net profits were realized from the venture. Mullins and Browning were unable to sell any coal from this seam after July, 1948, and for this reason they, as did other truck miners in the vicinity, shut down the mine.
In January, April and September, 1949, Mrs. Riner discussed operation of the mine with Mullins and Browning, but work was not resumed, and on September 29, 1949, she leased the coal on said tract of land to L. E. Sturgill and C. L. Cox, who took possession of the mine and the mining equipment placed on the premises by Mullins and Browning. In October, 1949, Sturgill and Cox refused to permit Mullins and Browning to remove this equipment. Thereafter, Mullins and Browning filed a bill in equity praying that Sturgill and Cox be enjoined from using the equipment and that they be permitted to remove it.
The chancellor sustained respondents' demurrer to the bill, on the ground that the property was personalty and complainants' remedy at law was adequate. After the dismissal of the suit in equity, Mullins and Browning, hereinafter referred to as "plaintiffs," instituted this action against L. E. Sturgill, C. L. Cox and Mary E. Riner to recover the value of the equipment, mining machinery etc. moved by them on the premises. Defendants pleaded not guilty and filed a counterclaim for the value of certain articles of equipment removed *486 from the premises by plaintiffs before the date of the lease to Sturgill and Cox. The trial court entered judgment on a verdict returned by the jury for defendants. To review that judgment, the plaintiffs obtained this writ of error.
Plaintiffs contend that the evidence is insufficient to support the verdict of the jury for defendants and that the trial court committed reversible error in refusing to set it aside.
The pertinent parts of the lease made by Mrs. Riner with Leedy and Wilfong, bearing date of March 29, 1948, are as follows:
"It is agreed that this lease shall commence from this date and continue so long as the parties of the second part hereto continue to mine and remove coal from the leased premises; provided that the parties of the second part hereto commence to operate within four (4) months from this date and continue to mine and remove coal from the leased premises and if the mining and removing of coal from the leased premises is discontinued or not performed and operated, for a period of thirty (30) days; except for disruptions due to labor disputes, strikes and other work shut downs; this lease shall terminate and be void.

* * * * * *
"The parties of the second part hereto are given the right and privilege to assign, sublease or sell this lease agreement at any time during the life of this agreement; provided, that the same royalties, covenants and agreements herein contained are made a part of said assignment, sublease or sale.
"It is mutually agreed between the parties hereto, that the said parties of the second part shall have ninety (90) days in which to move all of their equipment, mining machinery and other such articles or merchandise as they may desire to move after the termination, expiration or cancellation of this lease.

* * * * * *
"It is further agreed that all of the terms, conditions, covenants, stipulations and agreements, to be performed and observed by the respective parties hereto, shall be binding upon their successors and assigns, and shall inure to the benefit of the party or the said parties receiving same as successors or assigns and may enforce any and all of said terms, conditions, covenants, stipulations and agreements."
Plaintiffs, pursuant to their verbal agreement with J. H. Martin, agent for the sublessees, H. D. Martin and H. J. Crabtree, in June, 1948, for the purpose of mining the coal, moved the following equipment owned by them upon the premises: 6½ tons of steel rails, valued at $975; 300 steel and 20 wooden ties, valued at $345, and 4 steel mining cars, valued at $560.
Defendants contend that the equipment, mining machinery etc. in question were trade fixtures, and that title thereto passed to Mrs. Riner, the original lessor, upon the failure of plaintiffs to remove the same from the premises within ninety days after they stopped mining operations. On the other hand, plaintiffs contend that defendants having asserted in the suit in equity that the identical articles were mere chattels, they are estopped in this action to contend otherwise.
The question of what elements were necessary to determine whether an article was a fixture, or not a fixture, was before this court in Danville Holding Corporation v. Clement, 178 Va. 223, at page 231, 16 S.E.2d 345, at page 349, where Mr. Justice Spratley, speaking for the court, said:
"It is difficult, if not impossible, to frame any precise rule to determine whether an article used in connection with realty is to be considered a fixture or not a fixture. Each case must be decided according to its particular facts and circumstances. Certain general rules to determine the question, however, have been adopted by the great majority of our courts.
"In the absence of any specific agreement between the parties as to the character of a chattel placed upon the freehold, the three general tests are as follows: (1) Annexation of the chattel to the realty, actual or constructive; (2) Its adaptation to the use or purpose to which that part of the realty to which it is connected is appropriated; and (3) The intention of the owner of the chattel to make it a permanent addition to the freehold.
*487 "While, under the first test, there must be actual or constructive annexation, the method or extent of the annexation carries little weight, except insofar as they relate to the nature of the article, the use to which it is applied and other attending circumstances as indicating the intention of the party making the annexation.
"The second testadaptation of the chattel to the use of the property to which it is annexedis entitled to great weight, especially in connection with the element of intention. If the chattel is essential to the purposes for which the building is used or occupied, it will be considered a fixture, although its connection with the realty is such that it may be severed without injury to either.
"The intention of the party making the annexation is the paramount and controlling consideration. The test of intention is given a broad signification. It does not imply a secret, undisclosed action of the mind of the owner of the property. The intention need not be expressed in words; it may be inferred from the nature of the article affixed, the purpose for which it was affixed, the relationship of the party making the annexation and the structure and mode of annexation. 22 Am.Jur., Fixtures, section 6; 26 C.J., Fixtures, sections 2 and 3; 11 R.C.L., Fixtures, section 6."
The steel rails and ties were the only articles in question in any degree attached to the land. They were temporarily laid on top of the ground or on the floor of the mine, over which the cars ran hauling coal from the mine to the tipple. It is a matter of common knowledge that rails and ties of this nature are moved from time to time to different places in the same mine and from one mine to another. The cars are not attached to the realty. They simply roll upon the rails temporarily laid. It was not the intention of either the lessor or the plaintiffs to make the mining equipment a permanent accession to the realty. The lessor gave the lessees, Leedy and Wilfong "the right and privilege to erect any tipples, buildings, roadways, or tramways necessary or convenient to the successful operation and removal of the coal from the said leased premises," and gave the lessees "ninety (90) days in which to move all of their equipment, mining machinery and other such articles or merchandise as they may desire to move after the termination, expiration or cancellation of this lease."
The general rule applicable to the situation presented by this record is stated in 22 Am.Jur., Fixtures, Sec. 6, p. 719, as follows:
"This testthe intention of the party making the annexationis made the controlling criterion by most of the authorities, and generally it is considered to be the chief test. It is not always determinative, but in cases of doubt it has a controlling influence and must be considered. However, in order that a chattel may be converted into a fixture, the intention to make it a permanent accession to the realty must affirmatively and plainly appear; if the matter is left in doubt and uncertainty, the legal qualities of the article are not changed, and it must be deemed a chattel."
In 36 C.J.S., Fixtures § 1, p. 891, this is said: "Fixtures belong to that class of property which stands on the boundary line between the two grand divisions of things real and things personal, into which the law has classified property. In its ordinary signification the term `fixture' is expressive of the act of annexation; it necessarily implies something having a possible existence apart from realty, but which may, by annexation, be assimilated into realty, and denotes the change which has occurred in the nature and legal incidents of the property. They partake of the character, incidents, and properties of realty, and belong, in the ordinary case at least, to the person or persons owning the land; and * * * ordinarily may not be severed and removed without the consent of the owner."
If an article is a trade fixture and is not removed from the premises within the term or time specified in the lease, it becomes a part of the realty and title thereto vests in the lessor. If personal property placed on the leased premises by *488 the lessee is not a trade fixture, and is not attached to the realty, failure to remove it within the time specified in the lease does not ipso facto divest the lessee of his title. Defendants having asserted in the suit pending between the same parties concerning the same subject-matter that the property was personalty, they cannot now take an inconsistent position.
In view of all the facts and circumstances of this case we are constrained to hold that the property in question was never intended to become a part of the realty and plaintiffs were not divested of their title, even though the property was not removed from the premises within the time specified in the original lease.
Sturgill and Cox, as lessees of Mrs. Riner, acquired no higher or greater right to use the mining equipment than that acquired by Mrs. Riner. Her testimony discloses that whatever right she had prior to September 29, 1949, to declare a forfeiture of the lease for breach of condition was waived.
In summarizing Mrs. Riner's testimony on the subject of waiver, we must be guided by the principle stated in Massie v. Firmstone, 134 Va. 450, 462, 114 S.E. 652, 656, to the effect that a litigant's "statements of fact and the necessary inferences therefrom are binding upon him. He cannot be heard to ask that his case be made stronger than he makes it, where, as here, it depends upon facts within his own knowledge and as to which he has testified."
The meaning of the language "other work shut downs" used in the original lease is not clear. J. H. Martin and Mullins construed the quoted language to include a "work shut down" because of their inability to market the coal, and hence they did not consider that the "shut down" in July, 1948, gave Mrs. Riner a right to forfeit or cancel the lease.
While neither Martin nor Mullins notified Mrs. Riner of their reasons for shutting down the mine until several months after they had stopped work, she lived on the tract of land and knew why the plaintiffs and other truck miners ceased mining operations and she did not question plaintiffs' right to shut down for this reason until September, 1949.
Mrs. Riner testified that in January, 1949, more than five months after work had stopped, she saw Mullins near the mine, at which time he told her that he had taken a sample of coal to have it analyzed with the hope of finding a market for it, and that "he thought he might get to run again." She said "I told him I would like for him to run. It (the coal) wasn't doing nobody no good there. * * *"
In March or April, 1949, she saw Browning and another party at or near the mine and "asked them when they could go back, (to work) and they said they didn't know."
Later she saw one of plaintiffs who again told her they were not operating the mine because they could find no sale for the coal. She told him that others were selling coal in that vicinity, and if they could find sale for it why couldn't plaintiffs. Tivis Browning replied that he did not know. On neither of these occasions did she make any complaint other than the ones stated.
In June, 1949, and later, Mrs. Riner refrained from leasing the premises to other parties, as she said she knew that "* * they (Mullins and Browning) had stuff there, I wanted them to run it if they wanted to run it." She did not contradict the testimony of Arthur Ellis to the effect that a short time prior to September 18, 1949, he inspected the premises for the purpose of attempting to obtain a lease from Mrs. Riner, at which time she told him she would "lease it to me provided those fellows wanted to turn it loose. She wanted them to run it, but (if) they weren't able to run it, she wanted it run."
On or about September 18, 1949, Mrs. Riner determined to see that mining operations were resumed on the premises in question, but before leasing it to third parties she requested Arthur Ellis to drive her in his automobile to Darwin to see Mullins, stating that she desired to see "the ones (Mullins and Browning) that had that lease," and if they desired to operate the mine she wanted them to do so. In *489 her conversation with Mullins on this occasion, she asked him "what he was going to do about that coal." On cross-examination she was asked:
"Q. Yes, and you found him and asked him what he was going to do about that? A. Yes, sir, I asked him if he was going to go back to the mines.
"Q. And he told you that he wasn't any longer interested in operating the mine, that you would have to see Martin? A. No, sir. He told me as far as he was concerned he was through with that up there and I would have to see Martin, that he had given it up.
"Q. And at that time you asked him if he would sell the equipment, didn't you? A. Yes, sir, or lease it.
"Q. You asked him if he would sell or lease that equipment he had there at that time, didn't you? A. Yes, sir, September 18th, 1949.
"Q. What do you mean by that?
A. I didn't know it had come back to me.
"Q. You hadn't claimed it, had you? A. I didn't know it was mine until I went to see a lawyer. * * *
"Q. If you thought it was yours, why did you offer to lease or buy? A. I didn't ask to lease or buy. I asked if he would lease or sell.
"Q. And he told you he would except for one or two of those
A. Switches.
"Q. switches, mine switches, and that was agreeable to you? A. As far as I was concerned, it was."
A few days after this conversation with Mullins Mrs. Riner wrote Martin to the effect that inasmuch as other parties desired to lease the mine she was giving him five days in which to advise her whether or not he desired to mine the coal and if he did not see her about the matter within that time she would lease the premises to other parties. Delivery of the letter was delayed and Martin did not receive it until some time in October. Immediately on receipt of the letter he sent his wife to see Mrs. Riner, who informed her that the coal rights on the premises were leased on September 29, 1949, to Sturgill and Cox.
Mrs. Riner, as a witness, repeatedly said that if Martin or Mullins had signified an intention to operate the mine she would have been glad for them to do so. She also testified that she would have permitted them to remove their mining equipment from the premises at any time before September 29, 1949.
A few days after Sturgill and Cox began mining operations under their lease Mullins went on the premises for the purpose of removing the mining equipment. On this occasion he and Mrs. Riner discussed removal of the mining equipment. According to her own testimony quoted below she did not claim title to or ownership of the property:
"Q. Can you tell us your conversation with him then? A. Well, I told him he didn't come to take the stuff up and I had leased the mines.
"Q. Was that said with him? A. Well, he said that his stuff was up there that they had put up there, and he said that he would gohe told me he would either sell or lease it, the stuff.
"Q. Well, at that time did you make any statement to him about he would have that back or any words to that effect, that he could have this stuff back? A. Yes, the best I remember, I did.
"Q. And how did you tell him that? A. Well, he could have it when I got through with it. He had waited until I had leased the mines with the stuff in it, and he didn't come to get it before I leased it, and either he would have to wait until I got through with it; and if he come back in time before it had been leased, I would have been glad to have leased the mines to him again. * * *
"Q. Are you still willing to give him his stuff back when you are through with it?
A. Yes, sir."
There is a marked distinction between the right to use property temporarily and the right of absolute ownership.
The foregoing testimony of Mrs. Riner and the necessary inferences deducible therefrom, clearly show that she recognized the lease as being in force and effect as late as September 29, 1949. This *490 recognition of the right of plaintiffs constitutes a waiver of the lessor's right to declare a forfeiture of the lease prior to that date.
"Generally speaking, any recognition by a lessor of a tenancy as subsisting after a right of entry has accrued, where the lessor has notice of the forfeiture will have the effect of a waiver of the landlord's right to a forfeiture of the leasehold. Slight acts on the part of a lessor may be sufficient. Indeed, it has been ruled that any act on the part of the lessor, by word or deed, with knowledge of what has been done, which signifies his intention to affirm the lease, is conclusive evidence of a waiver of the forfeiture. 32 Am.Jur., Landlord and Tenant, Sec. 882, p. 747.
We hold that the plaintiffs are entitled to recover the value of the property in question at the time defendants converted it to their use. The evidence introduced by the respective parties is in conflict as to the condition, quantity and value of the property at the time of conversion. Under these circumstances it is not advisable for this court to enter final judgment. We, therefore, reverse the judgment of the trial court, set aside the verdict of the jury, and remand the case for trial upon only one issue, namely: the value of the property at the time of the conversion.
Reversed and remanded.