Don M. ARNOLD, Plaintiff,

v.

AMOCO OIL COMPANY and Workman Oil Company, Inc., Defendants.

Civ. No. 94–460–R.

United States District Court,
W.D. Virginia,
Roanoke Division.

Jan. 20, 1995.

Richard M. Bing, Richmond, VA, for Don M. Arnold.

Jack Robert Wilson, III, Robert Martin Rolfe, Hunton & Williams, Richmond, VA, for Amoco Oil Co.

Bernard Coleman Baldwin, III, Robert C. Wood, III, Edmunds & Williams, Lynchburg, VA, for Workman Oil Co., Inc.

## MEMORANDUM OPINION

WILSON, District Judge.

This is an action by Don M. Arnold against Amoco Oil Company (Amoco) and Workman Oil Company, Inc., (Workman) under the Petroleum Marketing Practices Act (PMPA), 15 U.S.C. § 2801, et seq. Jurisdiction is vested in this court pursuant to 15 U.S.C. § 2805. Arnold alleges that Amoco terminated his franchise agreement without providing an appropriate right of first refusal or bona fide offer as required by the PMPA. Amoco denies noncompliance with the PMPA and has filed a counterclaim seeking the court's declaration that Arnold cannot now accept Amoco's offer. The parties have filed cross motions for summary judgment on Arnold's claim, and Amoco has filed a motion for judgment on the pleadings on its counterclaim, which has been converted to a motion for summary judgment. After hearing arguments on the matter, the court concludes that Amoco violated no provision of the PMPA. The court further finds that Amoco's offer has expired. Thus, Arnold cannot now accept that offer. Accordingly, the court will grant summary judgment in favor

of Amoco and Workman and against Arnold on both Arnold's claim and Amoco's counterclaim.[1]

### I.

Amoco is a petroleum refining and marketing company, which, until recently, owned six gas station/convenience stores in the Roanoke, Virginia area. For a number of years, Don M. Arnold operated two of those Amoco-branded stations, Station #812 (station one) and Station #84752 (station six), as a franchised Amoco dealer. In mid-1992, Amoco considered ceasing all direct sales of motor fuel in the Roanoke market. (Mem. in Supp. of Pl.'s Mot. for Summ. J., Exh. B, Copeland Aff. at 14.) In late 1992, Workman, a distributor of Amoco-branded motor fuel in the Roanoke area, offered Amoco $3,000,000 for all six of its Roanoke area stations. (Mem. in Supp. of Pl.'s Mot. for Summ. J., Exh. D, Letter from Workman to Copeland of 12/31/92.) Amoco rejected the offer. Amoco and Workman then entered into negotiations and eventually reached a mutually acceptable price of $3,600,000, which was recorded in a sale and purchase agreement signed by the parties in March of 1994. (Mem. in Supp. of Amoco's Mot. for Summ. J., Exh. D, Sale and Purchase Agreement at 2.)

The Amoco/Workman agreement explicitly allocated the $3,600,000 among the six Amoco stations. Id. The sales of station one and station six, those operated by Arnold, were contingent upon Amoco's compliance with the PMPA, however. Id. at 6. In order to sell stations one and six to Workman, Amoco had to terminate Arnold's franchise agreement, an action which required Amoco to offer Arnold a right of first refusal on the two stations or to make Arnold a bona fide offer. As such, there was a chance that stations one and six would not be available to Workman. Foreseeing that possibility, Amoco and Workman allocated a price to each of the six stations and agreed that if Arnold purchased stations one and six, Workman would still purchase the four remaining stations for the

---

1. Although Workman has not joined in Amoco's motion for summary judgment, the court will grant judgment in favor of Workman. Arnold's case against Workman is derived from and de-pendent upon his claim against Amoco. Since Arnold's claim against Amoco is meritless, his claim against Workman fails as well.

amounts allocated to them. *Id.* In addition, the sale and purchase agreement modified the existing distribution contract between Amoco and Workman. Specifically, the modification increased the volume of motor fuel Amoco would supply Workman to at least eight million gallons annually for the next ten years. *Id.* at 7–8. In the event Workman purchased less than the specified amount, Workman would pay a penalty.

In April of 1994, Amoco notified Arnold that his franchise agreement would be terminated because Amoco was selling its Roanoke area stations. Amoco then offered Arnold a right of first refusal to purchase stations one and six at the price that Workman had offered for them—$925,000 for station one and $468,000 for station six. (Mem. in Supp. of Pl.'s Mot. for Summ. J., Exh. F, Letter from Copeland to Arnold of 4/4/94.) Amoco's offer was to expire on May 23, 1994. Arnold informed Amoco that he believed its offer failed to comply with the PMPA and that he had filed suit in state court seeking a declaratory judgment on the matter. (Mem. in Supp. of Amoco's Mot. for J. on the Pleadings, Exh. A, Letter from Arnold to Copeland of 5/13/94.) Arnold further stated that if the court ruled in Amoco's favor, he would accept the offered right of first refusal. *Id.* If the court ruled against Amoco, however, he would not accept the offer.

Arnold's suit had been filed against Amoco and Workman in the Circuit Court of Botetourt County, Virginia, seeking declaratory judgment that Amoco's termination of the franchise agreement failed to comply with the PMPA. Arnold also requested the court to enjoin Amoco's sale of the two stations to Workman and to order Amoco to make a bona fide offer to sell the stations to Arnold. In order to prevent Amoco's sale of the stations to Workman, Arnold then filed a motion for a preliminary injunction.[2] Amoco and Workman removed the action to this court, and Amoco counterclaimed against Arnold for a declaratory judgment that Arnold had failed to timely accept the right of first refusal. The case is now before the court on motions for summary judgment.

## II.

■ On a motion for summary judgment, the court must view the facts, and the inferences to be drawn from those facts, in the light most favorable to the party opposing the motion. *Ross v. Communications Satellite Corp.*, 759 F.2d 355 (4th Cir.1985). Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). However, "[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III.

The PMPA imposes restrictions on the termination or "nonrenewal" of franchise agreements by franchisors who are "engaged in the sale, consignment, or distribution of motor fuel in commerce." 15 U.S.C.S. § 2802(a) (Law.Co-op.1982). A franchisor may terminate or "nonrenew" a franchise only upon the grounds, and in compliance with the conditions, articulated within the PMPA. The following provision states one of those grounds, the one at issue in this case, and its conditions:

> [Upon] a determination made by a franchisor in good faith and in the normal course of business, if—(i) such determination is ... to sell such premises ... [and] such determination is not made for the purpose of converting the leased marketing premises to operation by employees or agents of the franchisor for such franchisor's account; and (iii) in the case of leased marketing premises such franchisor ... (I) made a bona fide offer to sell, transfer, or assign to the franchisee such franchisor's interests in such premises; or (II) if applicable, offered the franchisee a right of first refusal of at least 45 days duration of an

---

**2.** Arnold failed to bring this motion on for hearing, so it is not properly before the court. Note that during the pendency of this action, Amoco sold all six of its Roanoke stations to Workman.

offer, made by another, to purchase such franchisor's interest in such premises.

15 U.S.C.S. § 2802(b)(3)(D) (Law.Co-op.1982).

■ Congress enacted the PMPA to discourage the practice of franchisors compelling franchisees to comply with preferred marketing policies by threatening termination of franchise agreements. *See* S.Rep. No. 95–731, 95th Cong., 2d Sess. 17–19 (1978), *reprinted in* 1978 U.S.C.C.A.N. 873, 875–77. In passing the PMPA, Congress intended to balance fairly the franchisor/franchisee relationship:

> The PMPA's goal is to protect a franchisee's "reasonable expectation" of continuing the franchise relationship while at the same time insuring that distributors have "adequate flexibility ... to respond to changing market conditions and consumer preferences."

*Slatky v. Amoco Oil Co.*, 830 F.2d 476, 478 (3rd Cir.1987) (quoting Senate Report 95–731, at 19, 1978 U.S.C.C.A.N. 877). In an effort to limit federal intrusion into the property rights of franchisors, however, Congress established only minimum federal standards:

> The PMPA preserves the flexibility of petroleum delivery markets by ensuring that sound business judgment does not become a casualty of constant judicial oversight.

*Keener v. Exxon Co., U.S.A.*, 32 F.3d 127, 130 (4th Cir.1994), *petition for cert. filed*, (U.S. Dec. 22, 1994) (No. 94–1150). *See Sandlin v. Texaco Refining and Marketing Inc.*, 900 F.2d 1479, 1481 (10th Cir.1990) ("It is essential to recall Congress did not intend to intrude courts into the marketplace by permitting judicial seconding-guessing of the economic decisions of franchisors."), *cert. denied*, 498 U.S. 898, 111 S.Ct. 252, 112 L.Ed.2d 210 (1990).

Arnold claims Amoco failed to comply with the PMPA's minimal federal standards when it terminated his franchise agreement. Although Amoco offered Arnold a right of first refusal to purchase the stations, Arnold asserts that the PMPA's right of first refusal provision was inapplicable here and that, in any instance, the offer failed to satisfy the PMPA. Amoco contends that it complied with the PMPA's requirements because it offered Arnold a legitimate right of first refusal, and furthermore, its offer was "bona fide" under the PMPA. The court finds that Amoco indeed satisfied the PMPA's requirements. Amoco's offered right of first refusal was proper and sufficient under the PMPA. Even if not, however, the right of first refusal was equivalent to a bona fide offer.[3] The PMPA requires no more. Accordingly, the court will grant summary judgment in favor of Amoco and against Arnold.

### A.

■ The court first considers whether the right of first refusal offered to Arnold by Amoco satisfies the requirements of the PMPA. Arnold asserts that the nature of Workman's offer precludes Amoco from utilizing the PMPA's right of first refusal provision, and that even if the provision is applicable here, Amoco's offer to Arnold was not a legitimate right of first refusal because it differed from the offer that Workman made to Amoco. The court finds that the right of first refusal was proper and that Amoco's offer contained the same material provisions as the offer Workman made to Amoco. As such, Amoco complied with the PMPA.

■ A franchisor may satisfy the PMPA by providing its franchisee a right of first refusal of an offer made by a third party. 15 U.S.C.S. § 2802(b)(3)(D)(iii)(II) (Law.Co-op.1982). However, that option is only available when a right of first refusal is capable of meeting the objectives of the PMPA—to curtail unfair bargaining practices between franchisors and franchisees. For example, "[w]hen a third party's offer is a single transaction for cash, the court can justifiably infer that the amount of an arms' length offer represents the value of the station. On such facts, all a franchisee is entitled to is the right of first refusal." *Ellis v. Mobile Oil*, 969 F.2d 784, 786 (9th Cir.1992). When a third party's offer takes other forms, such as

3. That Amoco's decision to sell its Roanoke area stations was made "in good faith and in the normal course of business" remains unchal-lenged. As such, the court will not analyze that issue further.

an agreement to purchase or exchange multiple properties, however, the value of one individual station may not be apparent from the face of the transaction or the value allocated to the stations may be manipulated to the advantage of the franchisor. Thus, in some situations, courts have found the right of first refusal provision to be inapplicable. *Id.* Not every offer involving multiple properties suffers from those shortfalls. When the valuation of individual properties is readily apparent and there is no evidence of unfair manipulation, a right of first refusal is sufficient.

■ When a franchisor offers a station to a franchisee at the same price offered by a third party, a presumption of statutory compliance arises: "[Such an offer] creates the strong presumption that [the franchisor] fulfilled its right of first refusal obligation under § 2802(b)(3)(D)(iii)(II)." *Keener,* 32 F.3d at 131. This presumption reflects the PMPA's minimal intervention into a franchisor's business decisions. *Id.* It also simplifies the court's analysis:

> The presumption also comports with the desire not to transform a simple statutory requirement into a complex and cumbersome one necessitating a detailed economic analysis of private sector decisions.

*Id.*

Amoco offered Arnold the right to purchase stations one and six for a total of $1,393,000, the amount that Workman had offered for those two stations. However, Workman's offer contained more than a straightforward offer for the two properties.

It involved the purchase of six stations and contained provisions for Amoco's supply of motor fuel to Workman at a specified price. Since this is a situation where multiple properties and other obligations were negotiated in one offer, the court must scrutinize the following factors: (1) whether the valuations of stations one and six are readily apparent from the face of the offer, and (2) whether there is evidence that the valuations of the two stations were manipulated to Arnold's disadvantage.

The sale and purchase agreement between Amoco and Workman provided the offer price for each of the six Amoco stations. Station one was listed at $925,000 and station six at $468,000. (Mem. in Supp. of Amoco's Mot. for Summ. J., Exh. D, Sale and Purchase Agreement at 2.) Thus, the relevant valuations are apparent. The next question here is whether the valuations were manipulated by Amoco and/or Workman. It appears not. On the face of the agreement, there is no indication that the Workman valuations are exploitative, and Arnold has failed to produce contrary evidence.[4] Arnold asserts that the allocations seem artificial and arbitrary. As evidence, Arnold points to a note of an Amoco employee stating that he would "advise [Workman] to be reasonable" in assigning values to the stations. However, such a remark, alone, has little probative value.[5] It is certainly insufficient to create an issue of fact for the jury.

Arnold also argues that Amoco failed to offer him a true right of first refusal because Amoco's offer differed from the Workman

4. As such, this case is distinguishable from *Ellis v. Mobil Oil,* 969 F.2d 784, 786 (9th Cir.1992). In *Ellis,* a third party offered to exchange several properties with a franchisor, and in its internal valuations, the third party valued three of the franchisor's stations at zero, claiming that they had no economic worth. The court found those valuations spurious because, among other things, both the third party and the franchisor had earlier appraised the stations as having significant worth.

5. In Arnold's memorandum in support of his motion for a preliminary injunction, which was briefed but never argued to the court, he gives several other reasons for believing that the allocated valuations were manipulated. Even considering arguments and evidence submitted on

that motion, however, no triable issue arises. Arnold asserts that Workman's valuations fail to track the differing remediation costs for each station and, further, that the valuations do not reflect the comparative sales volume of the stations. (Mem. in Supp. of Pl.'s Mot. for Prelim. Inj. at 26–27.) The failure of the valuations to track those isolated factors does not necessarily show that the values were manipulated, however. Arnold also provides Amoco's preliminary property appraisals for the six stations—all of which are different from the allocations within Workman's offer. *Id.* at 25. The differences between Amoco's appraisals and Workman's offer do not show an obvious pattern of wrongful manipulation of the valuations, however, and Arnold has argued none.

offer. The total sale and purchase agreement between Amoco and Workman did contain terms not offered to Arnold. The bare fact that Amoco and Workman agreed to multiple obligations does not automatically invalidate a right of first refusal under the PMPA, however. The sale and purchase agreement was written so that the purchase of the Arnold stations could be severed from the agreement, a necessary precaution since Amoco had yet to offer Arnold the stations as required by the PMPA. As such, the other obligations between Workman and Amoco, such as the supply agreement, were not necessarily part of the specific offer for Arnold's stations.[6] In sum, there is no evidence that the part of Workman's offer that pertained to the Arnold stations differed in any material way from Amoco's offer to Arnold. Accordingly, the right of first refusal here appears to comply with the PMPA. Even if not, however, Amoco satisfied the PMPA as detailed below.

### B.

■ The court next considers whether Amoco made Arnold a bona fide offer under the PMPA. Amoco asserts that the right of first refusal offered to Arnold was equivalent to a bona fide offer such that it satisfied the PMPA. After considering the evidence submitted by the parties, the court concludes that the Amoco offer was indeed bona fide. Accordingly, the court will grant summary judgment in favor of Amoco and against Arnold.

■ Under the PMPA, a bona fide offer is an offer price at fair market value:

That, by definition, is the highest price a willing buyer would pay, and an offer at

fair market value protects the franchisee's reasonable expectation of being able to make a living with the franchise property.

*Slatky,* 830 F.2d at 484. The fair market value of any one property is a flexible concept, however: "[T]here is no universally infallible index of fair market value." *Id.* at 485 (quoting *Amerada Hess Corp. v. Commissioner,* 517 F.2d 75, 83 (3rd Cir.1975)). A range of prices may reasonably claim to be the fair market value. As such, an offer is bona fide if it merely approaches fair market value under an objectively reasonable analysis. *Ellis,* 969 F.2d at 787. Furthermore, in determining the fair market value of a property, no one valuation method is required. *Slatky,* 830 F.2d at 486 n. 9. *See also Ellis,* 969 F.2d at 787 n. 4 ("There are many acceptable ways to appraise property."). The facts of each individual case should set the terms of what constitutes a bona fide offer. *Id.*

Amoco contends that its offer to Arnold was bona fide. Amoco's offer was derived from the amounts allocated to the properties in Amoco's and Workman's sale and purchase agreement—allocations calculated by Workman. (Mem. in Supp. of Amoco's Mot. for Summ. J. at 3–4.) As such, an analysis of Workman's valuation methods is necessary. In reaching a valuation for each of the six properties, Workman used a discounted cash flow method of financial analysis on a computer financial model. (Mem. in Supp. of Amoco's Mot. for Summ. J., Exh B., Connelly Aff. at 1.) Workman inputted financial criteria such as current asset values, rates of return, and expected cash flows for the stations as they would operate in the future.[7] *Id.* Workman valued station one at $925,000 and station six at $468,000—the prices at

---

6. Furthermore, Arnold could have negotiated a similar supply agreement. In *Keener,* the court had little patience for a franchisee who similarly complained about the supply agreement between the franchisor and the third party: "[The franchisee] had every opportunity to assure a similar allotment of Exxon gasoline for himself by signing a contract with one of two Exxon distributors that offered to supply him if he purchased the station.... [The franchisee's complaints] are thus significantly blunted by his own ability to

secure supplies of Exxon gasoline." *Keener,* 32 F.3d at 131.

7. For some of the stations, Workman assumed that future marketing efforts would differ from current operations: "Workman assumed that certain of the stations would be converted to convenience store operations and that delis would be opened in stations deemed suitable for such operations." (Mem. in Supp. of Amoco's Mot. for Summ. J., Exh. B, Connelly Aff. at 2.)

which Amoco later offered the stations to Arnold.[8]

Arnold claims that the offer was not at fair market value, but he has provided the court with little evidence contesting the bona fide character of the Workman offer. Although Arnold disagrees with Workman's valuations, he provides no concrete criticisms of the valuation methods—only of the results.[9] Arnold has submitted none of his own comparative valuations of the stations [10]—only his subjective opinion that they were overvalued. Arnold essentially rests on his own suspicions that the Workman numbers are wrong. That is not enough to survive summary judgment.[11]

8. Amoco's internal valuations of the six stations provide further evidence that the Workman offer approached fair market value. Amoco performed its own valuation of the six stations using a projected cash flow method. Amoco calculated two minimum prices for each station depending upon whether Amoco would receive future income from guaranteed gasoline sales to Workman at each location. (Mem. in Supp. of Amoco's Mot. for Summ. J., Exh. 3, Spears Aff. at 114–116.) Both valuations are significantly higher than Workman's. Without the guaranteed fuel sales, Amoco calculated the price of station one at $995,600 and station six at $714,900, for a total of $1,710,500. That valuation is $517,500 more than the Workman offer. With guaranteed fuel sales, Amoco listed station one at $825,900 and station six at $645,500, together totalling $1,471,400—again significantly higher than the Workman offer.

9. Arnold complains that Workman failed to provide him with any documents reflecting the exact calculations used to obtain the valuations. That objection should have been made during discovery, however. Furthermore, Arnold deposed Workman's comptroller, G.T. Connelly, the person responsible for performing the calculations. Sufficient information regarding the nature of the calculations could have been obtained then.

10. At hearing on the motions for summary judgment, when the court requested Arnold's comparative valuations of the stations, Arnold's counsel pointed to earlier Amoco appraisals. However, Arnold's bare assertion that those earlier appraisals exemplify the two stations' fair market value is minimally probative without further discussion on the content and context of those appraisals. Arnold has provided no further evidence on the appropriate valuations of stations one and six. Other valuations performed separately by Workman and Amoco show that Amoco's offer indeed approached fair market value. Because of the strong evidence supporting the

## IV.

The court next considers Amoco's counterclaim, in which Amoco seeks a declaration from the court that Arnold cannot now exercise his right of first refusal. Amoco argues that Arnold rejected the offered right of first refusal when he purported to accept it with conditions, and that even if Arnold did not reject the offer, he failed to accept it within the requisite time period. In response, Arnold invokes the purposes of declaratory judgment and the PMPA and general principles of fairness. The court finds that Arnold's right of first refusal has expired. Accordingly, the court will grant summary judgment in favor of Amoco and against Arnold.[12]

offer's fair market value, Arnold's bare assertion is inadequate to raise a genuine issue of fact for the jury.

11. Arnold also claims that Workman's offer included assets belonging to Arnold. It is unclear whether Arnold is arguing that Amoco should provide him a discounted offer because of his investments in the property or whether Arnold seeks redress because Amoco sold his equipment. If Arnold is requesting a discounted price for the stations, his argument must fail. The PMPA requires a franchisor to offer the franchisee a right of first refusal or a bona fide offer. Either of those options might include payment for improvements or other investments made by the franchisee. The PMPA imposes only minimal requirements on the dealings between franchisors and franchisees. Issues not addressed within the PMPA, such as remuneration for fixtures or other franchisee expenditures, remain the subject of unfettered bargaining between a franchisor and franchisee.

On the second contention, no evidence exists that Amoco has sold equipment belonging to Arnold. The sale and purchase agreement between Amoco and Workman only transfers the "real property, together with any and all buildings, appurtenances, other improvements and fixtures situated thereon, all plants, shrubbery, trees, timber, and all of the right, title and interest of [Amoco] in any and all public and private roads." (Mem. in Supp. of Amoco's Mot. for Summ. J., Exh. D, Sale and Purchase Agreement at 1.) Any fixtures installed by Arnold may be sold as part of the property. *Mullins v. Sturgill*, 192 Va. 653, 66 S.E.2d 483 (1951). The evidence before the court shows no wrongful sale of property belonging to Arnold.

12. Although Amoco filed a motion for judgment on the pleadings, the motion will be treated as a motion for summary judgment because matters

A contract is created when a plain enforceable offer is followed by a plain enforceable acceptance. E. ALLEN FARNSWORTH, CONTRACTS § 3.3 (1982). The acceptance of the offer must correspond exactly to the terms of the offer, and if it does not, the purported acceptance is a rejection:

> [T]raditional contract doctrine requires that the offeree's commitment be one on the terms proposed by the offer with no variation. An attempt to add to or change the terms of the offer turns the offeree's response from an acceptance into a counteroffer and a rejection of the offer. This rule is sometimes called the "mirror image" rule because it requires that an acceptance be the mirror image of the offer.

Id. at § 3.21. An offer may be revoked at any time prior to its acceptance. The power to create a contract by accepting an offer terminates at the time specified in the offer.

Arnold's response to Amoco's offer was plainly not an unconditional acceptance:

> This is to advise Amoco that in the event the Court should find that the right of first refusal does comply with the requirements of the PMPA, then I will accept Amoco's offer of the right of first refusal for the two service stations. If, however, the Court should declare that the right of first refusal is invalid, then I will not accept this right of first refusal.

(Mem. in Supp. of Amoco's Mot. for J. on the Pleadings, Exh. A, Letter from Arnold to Copeland of 5/13/94.) As such, no enforceable contract exists between Arnold and Amoco. Furthermore, Arnold cannot now accept Amoco's offer. The offer set a specific time period in which it remained valid, approximately forty-five days. (Mem. in Supp. of Pl.'s Mot. for Summ. J., Exh. G, Letter from Copeland to Arnold of 4/29/94.) That time period has run.

Arnold's attempt to resuscitate Amoco's offer must fail. Nothing within the PMPA requires the court to abrogate ordinary contract principles when determining the rights of franchisors and franchisees. The court acknowledges that Amoco's offer required Arnold to make a difficult choice in a short period of time. Arnold was not without legal redress, however. Arnold could have moved for a preliminary injunction against Amoco's termination of his franchise agreement.[13] If successful, Arnold's franchises would have been secure until the conclusion of his action, and only at that time could Amoco have terminated the franchises in compliance with the offer requirements of the PMPA. The court will not now fashion a different remedy for Arnold.

## V.

For the reasons stated above, the court will grant summary judgment in favor of Amoco and Workman and against Arnold in regards to both Arnold's claim and Amoco's counterclaim.

---

outside the pleadings were presented to the court.

**13.** Arnold did move for a preliminary injunction in state court to prevent Amoco from selling the two relevant stations. Arnold later decided against arguing the motion before the court. It appears that Arnold attempted to enjoin only the sale of the stations, however, and not the actual termination and nonrenewal of his franchise agreement.