## CIRCUIT COURT OF ACCOMACK COUNTY

The Ace 1971 Trust,
The Gigi 1971 Trust,
and Hortense K. Seybolt, Trustee,

v.

Byrd Foods, Inc.

January 31, 1995

Case No. (Chancery) 94CH223

BY JUDGE GLEN A. TYLER

In this suit in chancery, the Court is called upon to resolve whether the doctrine of estoppel by silence will permit complainants to retain property now in their possession under facts which are to be determined by the chancellor from conflicting evidence.

This case comes before the Court upon a bill of complaint for injunctive relief sought by two trusts, The Ace 1971 Trust and The Gigi 1971 Trust, and their Trustee, Hortense K. Seybolt, against Byrd Foods, Inc. The real estate involved is a farm in Accomack County beneficially owned by the Trusts which was leased for the year 1994 to Byrd Foods and upon which there is equipment for the irrigation of crops. The irrigation equipment consists of pipes, connectors, valves, pumps, filters, tanks, and the like. Certain pumps, filters, and tanks for the irrigation system are on the adjoining farm owned or controlled by the Trustee or the Seybolt family. Near the end of 1994 and upon termination of the lease, Byrd Foods informed the Trusts, through their agents, that it intended to remove the irrigation equipment. The Trusts contend that they own the equipment, and this suit followed. At first, complainants sought a temporary injunction against the respondent pending litigation of the merits, but the parties soon

agreed that all questions, procedural and substantive, could be resolved at a trial ore tenus held on December 16, 1994.

While portions of the evidence are conflicting, those contentions are reflected in detail in the reporter's notes, and the Court will not review them pro and con in detail here. Suffice it to say that the Court finds, by clear and convincing evidence, the facts as set out in this opinion.

Wilson Byrd, brother of Carlton Byrd, who is the principal owner of Byrd Foods, owned a farm on the Eastern Shore, which is adjacent to land owned or controlled by the Trustee or the Seybolt family, members of which are beneficiaries of the Trusts. For a number of years Byrd Foods had rented and cultivated the Wilson Byrd Farm. Crops were raised, including staked tomatoes which require irrigation. Byrd Foods had purchased and installed all of the irrigation system and equipment that was being used in the tomato culture and which had substantial value.

As between Byrd Foods and Wilson Byrd, who had no ownership interest in or control of Byrd Foods, there was no conflict or misunderstanding regarding the irrigation equipment; Byrd Foods owned the equipment and could remove it. By the testimony of T. Lee Byrd, son of Wilson Byrd and Farm Manager of the extensive farming operation of Byrd Foods, it was established that irrigation equipment was readily and routinely installed on many of their farms, including the Wilson Byrd Farm. Installation is accomplished by burying certain portions of the piping three feet underground and by using above-ground connectors, piping, pumps, filters and the like. Irrigation systems can be and are from time to time taken up and moved in the regular course of farming to accommodate various crops and various farms as they are rotated or prepared, without damage to the farm land. According to an irrigation pond lease among the same parties as are involved in this case, entered into in 1990 for the use of water for irrigation, the parties were all aware that typically tomatoes are only grown and irrigated three out of five years on the same farm.

In 1993 Calvert Seybolt, on behalf of the Trustee of the Trusts, began negotiating with Wilson Byrd to purchase the farm for the Trusts. Apparently, Wilson Byrd, attempting to get the price up, told Seybolt that the farm was all the more valuable because it contained the irrigation system, saying to Seybolt that the system was worth $70,000. Seybolt was skeptical and believed that Wilson Byrd was generally unreliable, having been warned by others that if he dealt with Wilson Byrd, he had better get everything in writing. Consequently, Seybolt went to Gary Stewart, General Manager of Byrd Foods, and inquired about Wilson Byrd's claims of

value. Gary Stewart told Seybolt, in effect, that Wilson Byrd's estimate of the value of the irrigation system on the Wilson Byrd farm was very inflated. Then Stewart went further, to warn Seybolt that he questioned whether Wilson Byrd could convey the system with the farm, and that he did not think Wilson Byrd could convey the irrigation system to the Trusts. At trial, Stewart explained that he was aware that there were laws regarding attachments to real estate but did not really understand the law and was not certain. Nevertheless, Seybolt chose to go forward upon the basis of his, Seybolt's, belief in Wilson Byrd's statement that he could convey the farm with the equipment. Seybolt chose not to bring Stewart's warning to the attention of his attorney, George Walter Mapp, Jr., nor did Seybolt take any further steps during negotiations to determine the nature or extent of the ownership interests of Byrd Foods, or whether Byrd Foods owned the equipment. The parties to the farm sale, the Trusts and Wilson Byrd, reached an oral agreement but did not put it in writing and went directly to closing. The closing was held in the office of the Trustee's attorney, George Walter Mapp, Jr. In attendance were Mr. and Mrs. Wilson Byrd, Calvert Seybolt, George Walter Mapp, Jr., and Gary Stewart.

Stewart was in attendance for two reasons. First, Byrd Foods had agreed with the Trustee, pursuant to negotiations between Stewart and Calvert Seybolt, to continue to cultivate the farm for the year 1994, and Stewart was to sign the lease at the closing on behalf of Byrd Foods. Second, Stewart was to receive a check for Wilson Byrd's net proceeds of sale because the proceeds were to be applied to an existing debt owed by Wilson Byrd to Byrd Foods. There was no prior notice to Stewart or Byrd Foods that Stewart was to attend closing for any other reason, and Byrd Foods was not represented by counsel at any time. Specifically, there had been no other communication about the irrigation system after the date of the earlier conversation between Calvert Seybolt and Stewart and before the closing conducted on December 15, 1993. Both Seybolt and George Walter Mapp, Jr., at trial testified that they questioned Wilson Byrd's claims of ownership of the irrigation system and equipment and had doubts about his authority to convey it.

At the closing, a deed was presented by Mapp which conveyed the farm. The deed also contained a sentence that said "The above consideration and conveyance expressly include all of the irrigation equipment now located on said property." That sentence was brought to Stewart's attention at and before the conclusion of the closing. He made no response

about that sentence in the deed. Stewart was not requested to sign the deed. It was signed only by Mr. and Mrs. Wilson Byrd.

A lease was also presented by Mapp at the closing for execution by the Trusts and Byrd Foods for the lease of the same farm, described in the lease as follows: "The property that is the subject of the lease is known as 'Wilson Byrd,' located in Accomack County, Virginia, containing sixty-three acres (63 ac.) tillable crop land." It was dated December 15, 1993. At that time the irrigation equipment, which is the subject of this suit, was installed in and on the farm and adjacent thereto. The equipment was neither described nor referred to in the lease. There were in the lease references to the obligations of the tenant, Byrd Foods, to keep the farm roads in reasonably good condition, to control soil erosion, to use soil and water conservation practices, and a number of other detailed requirements on the part of the tenant, but nothing as to the irrigation equipment.

The sale was closed, checks were passed, the lease was signed and Byrd Foods cultivated the farm in tomatoes using the irrigation equipment for the crop year 1994.

Calvert Seybolt testified that he would not have agreed to close the purchase of the farm for the Trusts without the irrigation system. There was no allocation of the purchase price at closing between land and equipment. And there was no evidence adduced by the complainants regarding the value of the farm with the equipment and without the equipment, nor whether the fair market value would be affected one way or the other.

Neither of the parties in this case advanced any argument regarding actual or apparent authority on the part of those acting as agents. It is assumed, for purposes of this case, that Gary Stewart acted for Byrd Foods with appropriate and necessary power and authority and that Calvert Seybolt did likewise for the Trustee and the Trusts.

Initially, there is a question whether part or all of the irrigation equipment is affixed to the real estate. Wilson Byrd and Byrd Foods were landlord and tenant when the equipment was purchased and installed. The tenant purchased and installed the irrigation system and equipment at its expense. The system and equipment are readily movable, and it was a regular practice to do so in the farming business. Landlord and tenant were aware of these facts and circumstances. Personal property was installed and buried for the benefit of the tenant. It could be removed without appreciable damage in routine farming practices and the land restored to tillable condition. The tenant did not intend to enrich the landlord. According to the three-part test applied by Virginia's courts, the irrigation system

and equipment remain personal property. *Danville Holding Corp. v. Clement*, 178 Va. 223 (1941); *Mullins v. Sturgill*, 192 Va. 653 (1951); *Lamar Corp. v. City of Richmond*, 241 Va. 346 (1991). At the least and to the extent the equipment may have been affixed, it is removable as trade fixtures. *Bolin v. Laderberg*, 207 Va. 795 (1967).

As stated, the issue in this case is whether Byrd Foods will be estopped to claim its property, even though it could not have been lawfully conveyed to the Trusts by Wilson Byrd, by the silence of Gary Stewart when he was informed of the pertinent sentence in the deed at the closing of the sale of the farm.

Estoppel is essentially a principal in the law of torts developed in order to prevent loss to an innocent person. Restatement (Second), Agency, 8, comment d (1957). One may lose his property by failing to reveal the truth if he knows that another is acting under a misapprehension. One who knows that another is purporting to sell his property may be barred from recovery from a bona fide purchaser of it. Restatement (Second), Agency, 8B, comment c (1957). It is to be noted that where one claims estoppel, the law as to him is not unqualified. He must be innocent, under a misapprehension, or acting bona fide.

The doctrine of estoppel must be applied with great care, and the equity must be strong in its favor. 28 Am. Jur. 2d, *Estoppel*, 3 (1966). Each case of estoppel must in the nature of things stand on its own bottom, that is, the facts and circumstances of the particular case. *Id.* at 26. An estoppel may arise under certain circumstances from silence. But there must be some element of turpitude or negligence. There must be an intent to mislead. *Id.* at 53.

Virginia cases are in accord with the general law as stated above.

> It is generally well-settled that to constitute an estoppel by silence: (1) the concealment must have been with knowledge of the true state of facts, unless the party making it was bound to know the facts, or his ignorance of them was due to gross negligence; (2) the concealment must have been made in bad faith, with the intention that the other party should be misled as to his conduct, and (3) that the other party was misled to his injury. [Citing case.]
>
> Mere silence or inaction does not operate to create an estoppel. The authorities make a distinction between mere silence and a deceptive silence accompanied by an intent to defraud amounting to a positive beguilement. To operate as an estoppel there

must be not only a right but a duty to speak and the person upon whom that duty rests must have an opportunity to speak and knowledge of the circumstances requiring him to speak. The silence relied on must amount to bad faith, and this cannot be based upon a transaction upon which a party has neither knowledge nor means of knowledge. As sometimes stated, for mere silence to be effective, it must appear that the person to be estopped has full knowledge of all the facts and of his rights, and intend to mislead, or at least was willing that the other party might be misled by his attitude, and in consequence thereof acted as he would not have acted otherwise. [Citing cases.]

*Cantrell v. Booher Admx.*, 201 Va. 649 (1960).

Upon reviewing all of the testimony and exhibits and observing the testimony of all of the witnesses, it is clear that there is not present in this case the requisite deception, intent to defraud, or positive beguilement. And, there was not present the necessary knowledge on the part of the agent, Gary Stewart of Byrd Foods, regarding the effect and extent of the law of attachments. Further, while there was the payment of money by the Trustee and a change in the purchasers' position in that sense, and possibly to their detriment, there is the minor point that there was adduced no evidence that the purchaser could have or would have paid less for the farm without the equipment, though one may assume so or speculate to that extent. Certainly the Court has nothing upon which to base a decision under the law of Restitution, even assuming Byrd Foods was unjustly enriched. What amount would be restored? Moreover, it is difficult for a court to conclude that the purchasers intended to acquire title to the irrigation equipment and bind Byrd Foods by that sentence in the deed from another given the fact that the leaseback of the farm, prepared by the same attorney, signed at the closing by Gary Stewart for the purpose of binding Byrd Foods, contained no mention of the irrigation equipment which the purchasers contend they had just purchased as a part of the consideration for the farm.

Although this is not a tort case, the failure to heed or follow through on the warning given by Stewart to Seybolt is analogous to unreasonable reliance in tort situations. For there to be an expectation of a "conveyance by estoppel" is unreasonable. Since Byrd Foods' agent had previously warned of the doubt concerning ownership and authority on the part of Wilson Byrd, with the purchaser acknowledging his shared doubt, the purchaser was unreasonable in relying on any "message" conveyed by

silence under these circumstances. *See* Restatement (Second), Torts, 894 (1977). It would have been the simplest of legal transactions to include Byrd Foods in the conveyance documentation at closing and to have made it aware of such documentation previous to closing. The Trusts and counsel chose themselves to resolve any doubt or question, or ownership itself, by purposefully putting an agent of the true owner in a position of having to complain, the same agent who had already "raised a red flag" much less attempted to mislead or beguile.

In conclusion, the Court finds by clear and convincing evidence that the doctrine of estoppel will not, in the particular factual circumstances here, be applied to defeat the respondent's ownership of the irrigation system and equipment, including all parts thereof, located on the farm or on property adjacent to the farm.

Respondent will be required to remove such equipment promptly, weather permitting, and leave the farm land in reasonably good, undamaged condition.

Costs will be borne by the complainants.