[No. C021946. Third Dist. Oct. 22, 1997.]

FORTY-NINER TRUCK PLAZA, INC., et al., Plaintiffs and Appellants,
v.
UNION OIL COMPANY OF CALIFORNIA et al., Defendants and
Appellants.

**[Opinion certified for partial publication.[1]]**

---

[1]Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts 1.d., 1.e., 2., 3., 4., 5., 6., 7., 8., 9., and 10.

**COUNSEL**

John A. Trocki, Gerald D. Stern, McDonough, Holland & Allen, Glenn W. Peterson, Stephen L. Goff, Taylor, Thiemann & Aitken, Debra L. King and William L. Taylor for Plaintiffs and Appellants.

Harold E. Zahner, Brobeck, Phleger & Harrison, Kenneth L. Waggoner, John J. Wasilczyk, Bren C. Conner, Robert C. McNitt, Jr., Paul, Weiss, Rifkind, Wharton & Garrison, Lewis R. Clayton, Brad S. Karp, Jonathan H. Hurwitz, Lesley Szanto Friedman, Weintraub, Genshlea & Sproul, Geoffrey Burroughs and Amy J. Winn for Defendants and Appellants.

OPINION

**DAVIS, J.**—In the early 1990's, defendant Union Oil Company of California (Unocal) decided to sell its nationwide network of truck stops (network) to defendant National Auto/Truckstops, Inc. (National). Invoking Business and Professions Code section 20999.25, subdivision (a) (hereafter, section 20999.25(a)), the two plaintiffs, Forty-Niner Truck Plaza, Inc., of Sacramento (Forty-Niner) and Mid California Auto/Truck Plaza, Inc. of Santa Nella (Mid-Cal; collectively, the plaintiffs), asked Unocal for the opportunity to buy their respective truck stops, which were part of the network. Unocal gave Forty-Niner and Mid-Cal the chance to buy their truck stops on the same basic terms that National had offered.

When Forty-Niner and Mid-Cal were unable to make the purchases, they sued Unocal, National, and defendant Clipper Group, L.P. (Clipper), claiming that defendants had manipulated the purchase prices allocated to these two truck stops so that Forty-Niner and Mid-Cal would be unable to afford them. In a multimillion-dollar verdict, which included punitive damages, a jury found in the plaintiffs' favor. The trial court granted the defendants a new trial, finding in part that the weight of the evidence was against the verdict.

Both sides appeal. Each side raises several issues, most of which we discuss in the unpublished portion of this opinion. Basically, the plaintiffs contend the trial court erred in granting the defendants a new trial. The defendants claim the trial court did not go far enough and should have granted their motion for judgment notwithstanding the verdict (jnov).

In the unpublished portion of this opinion, we affirm the orders denying the jnov and granting the new trial. We also reverse an order of nonsuit on the civil conspiracy count involving National and Clipper.

In the published portion of this opinion, we examine several issues regarding section 20999.25(a) that are raised by the defendants' motion for jnov. Section 20999.25(a) allows a petroleum marketing franchisee, typically a service station operator, a bona fide opportunity to buy the station if the petroleum marketing franchisor, typically an oil company, is going to sell it to another. The defendants initially argue that section 20999.25(a) is legally invalid. We conclude that section 20999.25(a) is constitutional under the takings clause and in its breadth, and that section 20999.25(a) is not preempted by the federal Petroleum Marketing Practices Act (the PMPA; 15 U.S.C.A. § 2801 et seq.) in the circumstances presented here—where a station is sold to a third party but the franchise arrangement is merely

assigned to that buyer rather than ended. The defendants also argue that if section 20999.25(a) is valid, its first refusal option applies to a multisite purchase and the trial court erroneously defined the section 20999.25(a) term "bona fide offer." We conclude that the first refusal option of section 20999.25(a) can apply to a multisite purchase, and that the term "bona fide offer" in section 20999.25(a) should be construed consistent with the prevalent federal decisions construing the same term in the PMPA.

## BACKGROUND

In 1991, Unocal decided to sell the network, which encompassed 97 Unocal-branded truck stops. A group of Unocal operators, calling themselves Operation Orange Ball (Orange Ball), joined with investors arranged or spearheaded by Clipper in an effort to buy the network. Unocal wanted to sell the network intact. Clipper believed the network should be purchased intact to realize economies of scale.

In 1992, plaintiffs contacted Unocal and asked about buying their respective truck stops. Unocal passed this information on to Clipper.

Under section 20999.25(a), a franchisor (such as Unocal) who wants to sell service station premises that it owns and leases to franchisees (such as the plaintiffs' truck stops) may either: (1) make a "bona fide offer" to sell its interest in the premises to the franchisee; or (2) give the franchisee "a right of first refusal of any bona fide offer acceptable to the franchisor made by another to purchase the franchisor's interest in the premises."

Unocal asked Clipper and Orange Ball to make individual offers for the six Unocal truck stops in California. In developing these offers, Clipper examined income, strategic value to the network, replacement cost, and the value of the truck stops to a competitor. Clipper relied on information from Forrest Baker, a transportation economist with long-standing experience in the trucking industry. Baker told Clipper that "if Clipper gave up the California locations, [it] would essentially, inevitably move back to being a regional truckstop in the eastern United States." This was because, according to Baker, the 20 Unocal truck stops west of the Mississippi River, "served basically only one purpose, and that was to fuel bridge traffic to California."

Based on this analysis, Clipper and National, the company formed by Clipper and Orange Ball to effectuate the transaction, made the following offers on October 28, 1992, for the California truck stops: $7 million for Forty-Niner; $6.5 million for Mid-Cal; $11.5 million for Ontario; $8 million for Redding; $6 million for Buttonwillow; and $2 million for Blythe.

In letters sent in November 1992, Unocal offered the plaintiffs the chance to buy their truck stops for the prices National had offered. These letters gave the plaintiffs 30 days to accept the offers; Unocal later extended this deadline, at plaintiffs' request, until mid-February 1993.

On November 23, 1992, National and Unocal executed individual purchase agreements for the California truck stops in the amounts set forth above (six truck stops totaling $41 million). National and Unocal also signed a seventh contract for the purchase of the remainder of the network (91 truckstops totaling $141 million).

By December 1992, Forty-Niner and Mid-Cal had retained an experienced truck stop appraiser, MAI appraiser Charlie Brown, to value their properties.[2] Brown testified at trial on behalf of the plaintiffs, stating that he was retained to give an opinion of the fair market value of only the land and improvements comprising Forty-Niner and Mid-Cal, for "negotiating purposes."

Brown did not prepare standard "appraisal" reports for the plaintiffs. He prepared "letter reports" on each property, as he had done for Unocal on several occasions, arriving at fair market values of $2,650,000 for Mid-Cal and $2.3 million for Forty-Niner (including their fuel systems).

The plaintiffs refused to buy their leased properties for the amounts National had offered Unocal. National and Unocal then closed the network acquisition, including the California truck stops, in April 1993.

The plaintiffs sued Unocal, National and Clipper. The gist of the complaint alleged that Unocal violated section 20999.25(a) by not giving the plaintiffs a right of first refusal of a bona fide offer, or making them bona fide offers. Plaintiffs sued Unocal for specific performance and promissory estoppel, seeking injunctive relief, and for statutory violation and breach of the implied covenant of good faith and fair dealing, seeking damages. Plaintiffs sued National and Clipper for tortious interference with prospective economic advantage and for tortious interference with contract. Plaintiffs also added a conspiracy theory and a request for punitive damages against all defendants. The jury considered the legal claims while the court simultaneously heard the equitable claims.

At trial, the plaintiffs presented two exhibits and Unocal introduced another, showing internal valuations by Unocal of Forty-Niner and Mid-Cal.

[2] "MAI" signifies Brown is a Member of the Appraisal Institute, considered the top designation in the appraisal profession.

In the two exhibits introduced by plaintiffs, Mid-Cal was valued at $2.2 million and Forty-Niner at $3.2 million. In the exhibit introduced by Unocal, Forty-Niner was valued at $3.2 million, and an accompanying notation indicated a low probability of sale to the (former) truck stop operator at that price. Unocal's witnesses testified these valuations were "guesstimates" meant for various internal purposes, not accurate opinions of fair market value.

Dr. George Overstreet, the plaintiffs' economic expert, testified about the values National and Clipper had placed on the California truck stops. Initially, he testified about how the California values compared to the value of the whole network. (He did not include the Blythe truck stop in these calculations as that truck stop was not subject to section 20999.25(a); Unocal did not own, but only leased, those premises.) For example, Dr. Overstreet noted that while the California truck stops comprised 7.2 percent of the network's total rental income, 6.4 percent of the total diesel gallons sold by the network, and 7.5 percent of the total gallons sold by the network to trucking fleets, the same truck stops constituted over 21 percent of the network purchase price (the five truck stops were valued at $39 million by National and Clipper, and the ninety-seven-site network was bought for $182 million).

Dr. Overstreet then took National's purchase price of $182 million for the network and determined the prices that should have been allocated to Mid-Cal and to Forty-Niner within this $182 million figure. Dr. Overstreet determined that by paying $182 million for the network, National had paid $4.25 for every $1 of earnings generated by the network in 1991 before interest, taxes, depreciation and amortization. In economic parlance, Dr. Overstreet stated that National's purchase of the network had taken place at 4.25 times "EBITDA" (earnings before interest, taxes, depreciation and amortization). Applying the 4.25 EBITDA, Dr. Overstreet determined that Mid-Cal should have been allocated a $3 million price tag and Forty-Niner a $3.13 million-dollar figure in the $182 million network purchase. The plaintiffs' counsel had conceded in an *in limine* hearing that Dr. Overstreet was not an appraiser and would not testify on "fair market value." At trial, the judge had reminded the plaintiffs' counsel about this restriction.

The plaintiffs showed that National and Unocal had entered into a separate environmental agreement obligating Unocal to "buy-back" from National any of the California properties requiring environmental cleanup. The draft of this agreement specified that Unocal would buy back these properties either for their fair market value (as determined by an agreed, MAI appraiser) or for the purchase prices set forth in the California purchase

agreements between Unocal and National, whichever figure was higher. Unocal revised this draft to delete the provision involving the prices set forth in the California purchase agreements.

The plaintiffs also presented an array of evidence that the negotiations between Unocal and National/Clipper focused only on the network as a whole and did not involve the specific California truck stops. For example, the plaintiffs presented evidence showing that National offered Unocal $182 million for the 97 truck stops in the network (including the 6 California sites). Unocal accepted that offer by letter dated October 9, 1992. That letter does not mention the California truck stops or the prices for those locations. And the plaintiffs presented evidence that National and Clipper had admitted that "Unocal and National agreed . . . to a total cash purchase price for the entire network of $182 million . . . and that National subsequently made offers for each of the California properties for a total purchase price of $41 million."

The defendants presented two experts on value, Drs. Randall Pozdena and Henry Armour.

Dr. Pozdena used a capitalization rate income approach to value Forty-Niner and Mid-Cal. He concluded that Forty-Niner was worth about $8.8 million and Mid-Cal about $7.9 million.

Dr. Armour used a discounted cash flow income approach. He opined that Forty-Niner was worth approximately $7.7 million and Mid-Cal about $7.5 million, without considering value to the network.

The defendants also presented evidence that it would cost between $7 million and $10 million to replace the truck stops; that land values alone in the areas surrounding Mid-Cal and Forty-Niner approximated what National paid for the two truck stops; and that Mid-Cal's principal, David Buchanan, received approximately $550,000 in compensation from Mid-Cal in both 1993 and 1994.

The plaintiffs presented damages evidence, based on the theory that they would make more money as owners rather than lessees.

### DISCUSSION

1. *The Defendants' Motion for JNOV*

In their motion for jnov, the defendants raised legal and factual challenges. As for the legal challenges, the defendants contend that section

20999.25(a) is unconstitutional, is preempted by the PMPA, and, if the section is valid, it applies to a multisite purchase and incorporates a particular definition for "bona fide offer." As for the factual challenges, the defendants contend that plaintiffs failed to present sufficient evidence to prove liability and compensatory damages. We will address these contentions in order.

### a. Constitutionality—Takings Clause and Overbreadth

The defendants contend their motion for jnov should have been granted because section 20999.25(a) is unconstitutional. Defendants argue that section 20999.25(a) results in an unconstitutional taking because the statute restricts the franchisor's right to sell its property to the purchaser of its choice, and appropriates without compensation the franchisor's right to sell a right of first refusal.

The defendants also contend that section 20999.25(a) is unconstitutionally overbroad because its restrictions apply even when the franchisor's sale is structured, as it was here, so the franchisee can continue in business. The defendants are mistaken in both contentions.

Section 20999.25(a) provides: "In the case of leased marketing premises as to which the franchisor owns a fee interest, the franchisor shall not sell, transfer, or assign to another person the franchisor's interest in the premises unless the franchisor has first either made a bona fide offer to sell, transfer, or assign to the franchisee the franchisor's interest in the premises, other than signs displaying the franchisor's insignia and any other trademarked, servicemarked, copyrighted or patented items of the franchisor, or if applicable, offered to the franchisee a right of first refusal of any bona fide offer acceptable to the franchisor made by another to purchase the franchisor's interest in the premises."

Statutory enactments should be interpreted when possible to uphold their constitutional validity. (*Associated Home Builders, Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 598 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038]; see *Frisard* v. *Texaco, Inc.* (E.D.La. 1978) 460 F.Supp. 1094, 1101 [53 A.L.R.Fed. 336] [". . . this Court is under an obligation to construe the [PMPA] in such a way as to *avoid* any serious doubt of its constitutionality"; italics in original].)

For their takings claim, the defendants rely on *Gregory* v. *City of San Juan Capistrano* (1983) 142 Cal.App.3d 72 [191 Cal.Rptr. 47]. At issue in *Gregory* was the constitutionality of a city ordinance that required a mobilehome

park owner who was selling his park to first offer it for sale to the park residents.

The court in *Gregory* noted that although government, in the exercise of its police power, may properly regulate the use of property, a regulation may be so onerous as to constitute a taking of property requiring the payment of compensation. (142 Cal.App.3d at p. 88; see U.S. Const., 5th Amend.; Cal. Const., art. I, § 19.) ■ "The determination as to whether a regulation goes so far as to constitute a taking involves a balancing of the governmental interest sought to be advanced by regulating in the specified manner against the gravity of the interference with or impact on property rights resulting from the regulation." (142 Cal.App.3d at p. 88.) It has been repeatedly observed that the application of a general law to particular property effects a taking if the law does not substantially advance a legitimate state interest, or if it denies the landowner economically viable use of his or her land. (*Agins* v. *Tiburon* (1980) 447 U.S. 255, 260 [100 S.Ct. 2138, 2141, 65 L.Ed.2d 106]; see also *Ehrlich* v. *City of Culver City* (1996) 12 Cal.4th 854, 870 [50 Cal.Rptr.2d 242, 911 P.2d 429]; *Nollan* v. *California Coastal Comm'n* (1987) 483 U.S. 825, 834 [107 S.Ct. 3141, 3147, 97 L.Ed.2d 677]; *Dolan* v. *City of Tigard* (1994) 512 U.S. 374, 385, fn. 6 [114 S.Ct. 2309, 2316, 129 L.Ed.2d 304].)

*Gregory* concluded that the ordinance created an unconstitutional taking. This was because the ordinance abrogated a mobilehome park owner's right to sell its property to persons of its choice and appropriated the legally recognized property right to sell a right of first refusal, without furthering a sufficient governmental interest. (142 Cal.App.3d at pp. 88-89.) City authorities could offer only one purpose for the ordinance: to afford " 'mobilehome residents a measure of control over their own living situations.' " (*Id.* at p. 89.) As *Gregory* noted, this "suggested justification is entirely insufficient to legitimate the uncompensated appropriation of significant private property rights." (*Ibid.*)

■ When we balance the governmental interest advanced by section 25(a) against the gravity of section 20999.25(a)'s interference with the franchisor's property rights, we conclude that section 20999.25(a) does not create an unconstitutional taking.

Section 20999.25(a) substantially advances a legitimate state interest. The legislative history for section 20999.25(a) shows the statute was prompted by a concern that major oil companies were reducing the number of independently operated service stations in California because the oil companies (1) considered the average-sized service station no longer economically

viable for them to service and (2) wanted to have company-operated stations. (Assem. Office of Research, Feb. 13, 1981, pp. 2, 4-5.) According to the California Service Station Council, a service station dealer trade group, there were approximately 23,000 retail service stations in 1973; by 1981, when section 20999.25(a) was introduced, that number was down to 16,000 and falling rapidly. (*Id.* at p. 4.)

Against this backdrop, section 20999.25(a) substantially advances a legitimate state interest. It facilitates the purchase of retail service stations by their independent lessee-franchisees in contexts outside franchise termination and nonrenewal, thereby ensuring the motoring public greater access to service stations and furthering a more dynamic and full-service oriented (tires, batteries, tune-ups, etc.) retailing atmosphere. (Assem. Office of Research, Feb. 13, 1981, pp. 2, 4-5; Cal. Service Station Council, Letter of Mar. 17, 1981.) This interest is evident here, where plaintiffs, under section 20999.25(a), would have the chance to buy their truck stops even though their franchises are not ending.

Like its federal counterpart—the PMPA—section 20999.25(a) also seeks to protect the franchisee's reasonable expectation of continuing its business while allowing the franchisor adequate flexibility to respond to changing market conditions. (See *Ellis* v. *Mobil Oil* (9th Cir. 1992) 969 F.2d 784, 788 (*Ellis*); *Arbabian* v. *BP America* (N.D.Cal. 1995) 898 F.Supp. 703, 707; *California Arco Distributors, Inc.* v. *Atlantic Richfield Co.* (1984) 158 Cal.App.3d 349, 361-362 [204 Cal.Rptr. 743]; see also Bus. & Prof. Code, § 20999.1; *Building Material & Construction Teamsters' Union* v. *Farrell* (1986) 41 Cal.3d 651, 658 [224 Cal.Rptr. 688, 715 P.2d 648], and *Los Angeles Met. Transit Authority* v. *Brotherhood of Railroad Trainmen* (1960) 54 Cal.2d 684, 688-689 [8 Cal.Rptr. 1, 355 P.2d 905] [federal decisions construing a federal statute can be used to construe the terms of a similar or "patterned after" state statute]; Finance, Insurance, and Commerce Com., Assem. Bill No. 372, Mar. 31, 1981, pp. 1-3; Sen. Republican Caucus, Assem. Bill No. 372, July 1, 1981, p. 2; Assem. Office of Research, Feb. 13, 1981, pp. 1-2, 4-5; Sen. Com. on Business and Professions Bill Analysis Work Sheet, Assem. Bill No. 372, Mar. 9, 1981 and Apr. 3, 1981, Mem. and Letter from Bruce McDiarmid, for Chevron U.S.A., Inc.; Finance, Insurance & Commerce Com., Assem. Bill No. 372 (1981-1982 Reg. Sess.) as it will be amended, May 5, 1981, pp. 1-3; 3d reading, Assem. Bill No. 372 (1981-1982 Reg. Sess.) as amended May 7, 1981, pp. 1-2; Enrolled Bill

Rep., Assem. Bill No. 372 (1981-1982 Reg. Sess.) Sept. 9, 1981.)[3] Section 20999.25(a) thereby protects the franchisee in a way reasonable to the franchisor, while promoting access to service stations for the motoring public. (Cal. Service Station Council, Letter of March 17, 1981; Assembly Office of Research, Feb. 13, 1981, pp. 1-2, 4.)

While the PMPA and section 20999.25(a) protect the franchisee from the franchisor's unbounded power to threaten or effectuate the end or reassignment of the franchise, and while section 20999.25(a) facilitates the purchase of the service station by the franchisee leasing and operating it (outside the PMPA context of termination or nonrenewal), these laws establish only "minimal standards" so as to limit governmental intrusion into the property rights of the franchisor. (See *Keener* v. *Exxon Co., USA* (4th Cir. 1994) 32 F.3d 127, 130 (*Keener*).) Under section 20999.25(a), the franchisor may either make the franchisee a "bona fide offer to sell" the service station, or it may offer the franchisee "a right of first refusal of any bona fide offer" made by another. Both options "fully reserve the price determining function to market actors." (See *Keener*) As we shall explain later in this opinion, a "bona fide offer" is one that approaches fair market value under an objectively reasonable analysis. (See *Arnold* v. *Amoco Oil Co.* (W.D.Va. 1995) 872 F.Supp. 1493, 1500 (*Arnold*); *Ellis, supra,* 969 F.2d at p. 787.) This objective fair market standard protects the franchisor's legitimate property rights in selling its property. (See *Ellis, supra,* 969 F.2d at p. 788; *Keener, supra,* 32 F.3d at p. 130.)

*Ballstaedt* v. *Amoco Oil Co.* (N.D. Iowa 1981) 509 F.Supp. 1095 is instructive on the taking issue. There the court held that applying the PMPA to a lease and franchise agreement entered into prior to the PMPA's effective date did not result in an unconstitutional taking of the defendant oil company's property. This is because ". . . the interference with defendant's contractual rights is simply too insubstantial to offend the fifth amendment." (509 F.Supp. at p. 1097.)[4]

We conclude that section 20999.25(a) on its face does not result in an unconstitutional taking of private property for public use without just compensation.

---

[3]We have reviewed the legislative history of section 20999.25(a). We decline Unocal's request to take judicial notice of particular parts of that history as illustrating "most clearly" the legislative intent of section 20999.25(a).

[4]The defendants also cite to *Nollan* v. *California Coastal Comm'n, supra,* 483 U.S. 825, *Dolan* v. *City of Tigard, supra,* 512 U.S. 374, and *Ehrlich* v. *City of Culver City, supra,* 12 Cal.4th 854. Those cases are factually inapposite. They concern exactions by local governments or agencies in exchange for issuing development permits to property owners.

■ As for their remaining constitutional challenge, the defendants claim that section 20999.25(a) is unconstitutionally overbroad because its restrictions apply even to a sale that is structured so the franchisee continues in business.

The PMPA applies when a franchise is terminated or not renewed. (15 U.S.C.A. § 2806(a); *Ervin* v. *Amoco Oil Co.* (Colo.Ct.App. 1994) 885 P.2d 246, 256; *Patel* v. *Sun Co., Inc.* (E.D.Pa. 1994) 866 F.Supp. 871, 873; *California Arco Distributors, Inc.* v. *Atlantic Richfield Co., supra,* 158 Cal.App.3d at p. 362.) The PMPA does not cover a situation where the franchise continues, such as when a franchisor assigns its obligations to another. (15 U.S.C.A. § 2806(b)(1); *California Service Station etc. Assn.* v. *Union Oil Co.* (1991) 232 Cal.App.3d 44, 51-52 [283 Cal.Rptr. 279]; *Chaney* v. *Shell Oil Co.* (1992) 111 Or.App. 556 [827 P.2d 196, 200].) The legislative history for section 20999.25(a) notes, "[t]he sponsor of [section 20999.25(a)], . . . states that the bill is intended to address circumstances not covered under the [PMPA]. The sponsor maintains that federal law is not clear with respect to circumstances other than expiration of an underlying lease[.]"[5] (Finance, Insurance, and Commerce Com., Assem. Bill No. 372, Mar. 31, 1981, pp. 2-3, underlines in original.)

Thus, section 20999.25(a)'s scope encompasses a situation where the franchisor is going to sell the service station premises but will assign rather than end the franchise arrangement. Section 20999.25(a) is not designed to cover franchise termination or nonrenewal in a way different than the PMPA.[6] The Legislature may reasonably have concluded that protection for the franchisee is needed where the franchise continues but in a new context, such as an assignment. Moreover, section 20999.25(a) forecloses a franchisor from impermissibly using an assignment (or some other continuation) of the franchise to skirt the termination or nonrenewal requirements of the PMPA. As we have seen, section 20999.25(a) facilitates the purchase of service stations by their independent lessee-franchisees, thereby furthering more service station access for the motoring public. The defendants see unconstitutional overbreadth because their view of section 20999.25(a)'s scope is too narrow, as applying only if the franchisee's business is ending.

We conclude that section 20999.25(a) is not unconstitutionally overbroad by applying to sales of service station premises that are structured so the franchisee continues in business.

---

[5]As an example of section 20999.25(a)'s coverage, the legislative history notes that an oil company may have an option to destroy the existing improvements on the property before the expiration or termination of a lease. (Finance, Insurance, and Commerce Com., Assem. Bill No. 372, Mar. 31, 1981, p. 3.)

[6]As we shall see in the next section of this opinion, section 20999.25(a) must be construed to be the same as the PMPA with respect to franchise termination or nonrenewal. (15 U.S.C.A. § 2806(a)(1).)

### b. *Preemption*

██ The defendants contend their motion for jnov should have been granted because the PMPA preempts section 20999.25(a). Largely for the reasons expressed above, the defendants are mistaken. The PMPA and section 20999.25(a) occupy different spheres outside the context of franchise termination or nonrenewal.

The PMPA contains an express preemption provision. It states in part: "(a)(1) To the extent that any provision of this subchapter applies to the termination (or the furnishing of notification with respect thereto) of any franchise, or to the nonrenewal (or the furnishing of notification with respect thereto) of any franchise relationship, no State or any political subdivision thereof may adopt, enforce, or continue in effect any provision of any law or regulation (including any remedy or penalty applicable to any violation thereof) with respect to termination (or the furnishing of notification with respect thereto) of any such franchise or to the nonrenewal (or the furnishing of notification with respect thereto) of any such franchise relationship unless such provision of such law or regulation is the same as the applicable provision of this subchapter. [¶] . . . [¶] (b)(1) Nothing in this subchapter authorizes any transfer or assignment of any franchise or prohibits any transfer or assignment of any franchise as authorized by the provisions of such franchise or by any applicable provision of State law which permits such transfer or assignment without regard to any provision of the franchise." (15 U.S.C.A. § 2806.)

The preemption doctrine has its roots in the supremacy clause. (U.S. Const., art. VI, cl. 2.) ██ "When Congress expressly states in its enactment which areas of state authority are preempted, a state law will fall if (1) a direct conflict exists between the state and federal regulation such that it is impossible to comply with both laws, . . . or (2) the state regulation 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress'. . . , or (3) when Congress has 'taken possession of the field' in a particular area so as to displace all state regulations regardless of whether or not they are compatible." (*California Service Station etc. Assn. v. Union Oil Co., supra*, 232 Cal.App.3d at p. 51, citations omitted.) "State and federal laws should be accommodated and harmonized where possible so that preemption can be avoided." (*California Arco Distributors, Inc. v. Atlantic Richfield Co., supra*, 158 Cal.App.3d at p. 359.)

██ As noted in the previous section of this opinion, the PMPA covers franchise termination and nonrenewal while section 20999.25(a)'s scope encompasses a situation where the franchisor is going to sell the service

station premises but will assign rather than end the franchise arrangement. As the parties concede here, there has been no franchise termination or nonrenewal—simply an assignment of the franchise arrangement. It is for this reason that the PMPA does not preempt section 20999.25(a) here.

■ "The preemption provision of the PMPA is limited to provisions of state law dealing with the termination or nonrenewal of franchise relationships [where the state law differs from the PMPA]. Congress did not intend to authorize or prohibit franchise assignments, but, as a general rule, left the matter for state regulation." (*California Service Station etc. Assn.* v. *Union Oil Co., supra,* 232 Cal.App.3d at pp. 51-52; see 15 U.S.C.A. § 2806(b)(1).) "That the state chooses to regulate relationships which are not [covered] under PMPA . . . would merely complement the federal regulatory purpose and scheme. As such, state law . . . is not preempted . . . ." (*Automatic Comfort Corp.* v. *D & R Service, Inc.* (D.Conn. 1986) 627 F.Supp. 783, 784; see also *Ervin* v. *Amoco Oil Co., supra,* 885 P.2d at p. 256 ["[T]he dealers do not allege either termination or non-renewal [in their suits against Amoco for tortious interference of contract and prospective economic advantage], and thus, we conclude [the PMPA] does not apply"]; *Patel* v. *Sun Co., Inc., supra,* 866 F.Supp. at p. 873 ["If a franchisor does not terminate or fail to renew the franchise relationship the right to an offer of sale or first refusal is not triggered [under the PMPA]."].)

The defendants look to *Arbabian* v. *BP America, supra,* 898 F.Supp. 703. It is true the court in *Arbabian* determined that section 20999.25(a) was preempted by the PMPA. (898 F.Supp. at p. 706.) However, the court did so in the context of franchise termination. (*Ibid.*) Section 20999.25(a), as it pertains to franchise assignment, is not preempted if the assignment is not incident to a termination or nonrenewal under the PMPA. (*California Service Station etc. Assn.* v. *Union Oil Co., supra,* 232 Cal.App.3d at p. 53 [". . . it is apparent that the PMPA permits franchise assignments to be regulated by state law so long as the assignment does not affect termination or nonrenewal"].)[7]

The defendants also set their preemption sights on the concept of market withdrawal, a concept within the focus of the PMPA. (15 U.S.C.A. § 2802(b)(2)(E).) However, the PMPA's focus on market withdrawal is still within the context of franchise termination or nonrenewal. (*Ibid.*) As the parties concede, there has been only an assignment of the franchise here and no franchise termination or nonrenewal.

---

[7]We accept Unocal's requests to take judicial notice of the unpublished, December 15, 1994, order in *Arbabian* v. *BP America* (U.S. Dist. Ct. (N.D.Cal.), 1994, No. C94-0523 SBA), and the July 28, 1997 order in *Simmons* v. *Unocal Corporation* (U.S. Dist. Ct. (N.D.Cal.), 1997, No. CV 97-1759 ABC (SHx)). (Evid. Code § 452, subd. (d)(2).)

We conclude that section 20999.25(a) is not preempted by the PMPA under the circumstances presented here.

c. *The Term "Bona Fide Offer" in Section 20999.25(a) and the Standards for Right of First Refusal in a Multisite Purchase*

■ Having concluded that section 20999.25(a) is constitutional and not preempted by the PMPA, we come to two issues raised by the defendants' motion for jnov concerning the applicability of section 20999.25(a). The first issue is whether section 20999.25(a)'s right of first refusal option can apply to the sale of an individual site that is part of a sales transaction encompassing many sites. The second issue concerns the definition for the term "bona fide offer" in section 20999.25(a). As the trial court recognized, the plaintiffs' "entire case turns on whether the offers communicated to each plaintiff by Unocal were bona fide, because it is established that Unocal gave plaintiffs the right to purchase on the same essential terms as National and plaintiffs refused."

As the trial court also explained: "Th[is] Court established early in the trial that to determine whether bona fide offers were made to plaintiffs or, in the alternative, whether Unocal tendered bona fide offers of National for a right of first refusal, that a variety of factors, anything in reason and some eight listed factors, would be determinative. . . . The Court rejected a so called 'objective' standard, such as fair market value [as the definition for 'bona fide offer'], for a variety of reasons. Mainly, the California statute does not use the term in . . . section 20999.25(a) [and] . . . a finding of fair market value is uncertain at best, given the usual spread in expert opinion evidence[.]" Instead, the trial court instructed that fair market value is simply one of eight specific factors that can be used in determining whether an offer under section 20999.25(a) is bona fide.[8]

We conclude the trial court erred in defining the section 20999.25(a) term "bona fide offer" in this manner. The court should have defined "bona fide

---

[8]At the outset of trial, the plaintiffs moved *in limine* to limit the proof of a bona fide offer to objective fair market value. The trial court denied this motion, instead concluding "that a variety of factors, anything in reason and some eight listed factors, would be determinative." As to these eight factors, the trial court instructed the jury: "A bonafide offer is one made in good faith, honestly and without deceit or fraud, one that is genuine and not a sham. . . . . In determining whether or not Defendant Unocal violated plaintiffs' rights under [section 20999.25(a)], you may consider anything in reason based upon the evidence and law that would prove whether or not Unocal either made a bonafide offer to plaintiffs, or submitted a bonafide offer to plaintiffs as made by National, including but not limited to the following: One, the contracts between National and Unocal as they were submitted to plaintiffs and the terms and conditions of the same; Two, the terms and conditions under which Unocal submitted the offers to plaintiffs; Three, the negotiations and conduct of said defendants in arriving at the contract terms and the presence [or] absence of any wrongful conduct; Four, the intent of said defendants; Five, the values, if any, placed upon the . . . subject properties

offer" as that term is defined under the prevalent federal view. Under the prevalent federal view, a "bona fide offer" is one that approaches fair market value under an objectively reasonable analysis, a concept we will explain later in this opinion. We also adopt the federal standards for how a right of first refusal works where several properties are being sold in one transaction.

We must start our analysis with the "bona fide offer" language of section 20999.25(a). That language requires a franchisor to either make a "bona fide offer to sell . . . to the franchisee the franchisor's interest in the premises . . or, if applicable, offer[] to the franchisee a right of first refusal of any bona fide offer acceptable to the franchisor made by another to purchase the franchisor's interest in the premises."

In this transaction, Unocal sold National a nationwide network of 97 truck stops for $182 million. Six of those ninety-seven truck stops were in California. National placed a value of $41 million on the six California sites, including $7 million for Forty-Niner and $6.5 million for Mid-Cal. Unocal gave plaintiffs a right of first refusal to match National's offers.

Initially, we must ask whether section 20999.25(a)'s right of first refusal option is even legally available in this 97-site purchase. We conclude it is.

California law recognizes that parties to a purchase transaction involving many sites can allocate a portion of the total purchase price to a single site to allow another party to exercise a right of first refusal on the single site. In *Park Plaza, Ltd.* v. *Pietz* (1987) 193 Cal.App.3d 1414 [239 Cal.Rptr. 51], Park Plaza entered into a joint venture agreement with Red Lion to develop a hotel. The agreement gave each joint venturer the right of first refusal if the other joint venturer desired to sell its interest to a third party. (193 Cal.App.3d at p. 1416.)

Red Lion later wanted to sell its interest in approximately 50 hotels, including its interest in the Park Plaza joint venture, to a third party. Recognizing Park Plaza's right of first refusal, Red Lion and the third party subsequently allocated a purchase price to the Park Plaza joint venture on the same basis that was used to establish the price for the other hotel interests. (193 Cal.App.3d at pp. 1416-1417.)

Park Plaza complained that even if a portion of the lump-sum price for the 50 hotels was fairly allocated to the Park Plaza joint venture interest, a

separately or as a network by either of said defendants; Six, the fair market value of the subject premises; Seven, whether said defendants actually completed the sale of the subject properties in accordance with the terms of the contract; And Eight, the price National paid for the other properties and assets of the network it purchased from Unocal."

proper right of first refusal to Park Plaza could not be made. (193 Cal.App.3d at p. 1420.) Disagreeing, the court in *Park Plaza* noted that the price allocation to the joint venture interest was not artificial, was not unreasonable, and was not conduct inimical to the rights of Park Plaza. (*Id.* at p. 1421, fn. 2.)

At least two federal decisions have recognized that the PMPA's right of first refusal option (on which section 20999.25(a)'s first refusal option is patterned) is available where several properties are bought for a lump sum and individual properties are allocated a price in that sum. (*Arnold, supra,* 872 F.Supp. 1493; see *Ellis, supra,* 969 F.2d 784; see Sen. Com. on Business and Professions Bill Analysis Work Sheet, Assem. Bill No. 372, Memo., Mar. 9, 1981, p. 1, subd. (c), and Letter, Apr. 3, 1981, p. 2, ¶ 4, Bruce McDiarmid for Chevron U.S.A., Inc.)

*Arnold* is particularly instructive. It states: "When a third party [agrees] to purchase or exchange multiple properties, . . . the value of one . . . station may not be apparent from the face of the transaction or the value allocated to the stations may be manipulated to the advantage of the franchisor. . . . . Not every offer involving multiple properties suffers from those shortfalls. When the valuation of individual properties is readily apparent and there is no evidence of unfair manipulation, a right of first refusal is sufficient." (872 F.Supp. at pp. 1498-1499; see *Ellis, supra,* 969 F.2d at p. 786.)

The facts in *Arnold* showed that Amoco sold six gas stations to Workman Oil Company for $3.6 million. Arnold operated two of those stations, numbers one and six. The PMPA applied to Arnold's stations because Amoco had to terminate Arnold's franchise agreements to make the sale to Workman. (872 F.Supp. at p. 1496.) Amoco and Workman allocated a price to each of the six stations and agreed that if Arnold purchased stations one and six, Workman would still purchase the four remaining stations for the amounts allocated to them. (*Id.* at pp. 1496-1497.)

Arnold sued Amoco for violating the PMPA. In granting a summary judgment to Amoco and Workman, the court in *Arnold* noted that the valuation of stations one and six was readily apparent. This was because the agreement between Amoco and Workman specified the price for each of the six Amoco stations. (872 F.Supp. at p. 1400.) As for evidence of unfair manipulation, there was no indication on the face of the agreement that the Amoco-Workman valuations were exploitative, and Arnold failed to produce any meaningful contrary evidence. (*Ibid.*)

We conclude that these standards from *Arnold* sanctioning the use of the PMPA's right of first refusal in a multisite purchase transaction can apply to

the right of first refusal in section 20999.25(a). This is because section 20999.25(a) was patterned after the PMPA in this respect. (Sen. Com. on Business and Professions Bill Analysis Work Sheet, Assem. Bill No. 372, Memo., Mar. 9, 1981, p. 1, subd. (c), and Letter, Apr. 3, 1981, p. 2, ¶ 4, Bruce McDiarmid for Chevron U.S.A., Inc.; *Building Material & Construction Teamsters' Union* v. *Farrell, supra,* 41 Cal.3d at p. 658; *Los Angeles Met. Transit Authority* v. *Brotherhood of Railroad Trainmen, supra,* 54 Cal.2d at pp. 688-689 [federal decisions construing a federal statute can be used to construe the terms of a similar or "patterned after" state statute].)

Having concluded that section 20999.25(a)'s right of first refusal option can lawfully apply to a multisite purchase transaction, that brings us to the term "bona fide offer" because that term is the linchpin of the franchisor's first refusal option under section 20999.25(a). Under section 20999.25(a), the franchisor must either make a bona fide offer to sell its interest in the service station premises to the franchisee, or offer the franchisee a right of first refusal of any acceptable bona fide offer made by another. Either way, a bona fide offer has to be forwarded.[9]

The federal cases have debated whether the term "bona fide offer" in the PMPA denotes a subjective belief of fair market value or an objective analysis of one. (*Brownstein* v. *Arco Petroleum Products Co.* (E.D.Pa. 1985) 604 F.Supp. 312, 315; *Kessler* v. *Amoco Oil Co.* (E.D.Mo. 1987) 670 F.Supp. 853, 860; *Slatky* v. *Amoco Oil Co.* (3d Cir. 1987) 830 F.2d 476, 480-485 (*Slatky*); *LCA Corp.* v. *Shell Oil Co.* (8th Cir. 1990) 916 F.2d 434, 437 (*LCA Corp.*).) Some courts have concluded that both approaches apply. (*Slatky, supra,* 830 F.2d at p. 485; *LCA Corp., supra,* 916 F.2d at p. 437.) The prevalent federal view, and the one employed by the Ninth Circuit, focuses on whether the offer approaches fair market value under an objectively reasonable analysis. (*Ellis, supra,* 969 F.2d at p. 787; *Arnold, supra,* 872 F.Supp. at p. 1500; *Sandlin* v. *Texaco Refining and Marketing Inc.* (10th Cir. 1990) 900 F.2d 1479, 1481 (*Sandlin*).)

The objective approach of *Ellis* is the most workable one for the term "bona fide offer" in section 20999.25(a). Subjective belief of value can be ethereal. The objective approach is simpler than the combined approach, but is nearly as comprehensive. If the objective test is met, it is likely the subjective is as well. Thus, in determining if section 20999.25(a) has been violated, the trier of fact should determine whether the offer approaches fair market value under an objectively reasonable analysis. (*Arnold, supra,* 872 F.Supp. at p. 1500; *Ellis, supra,* 969 F.2d at p. 787.)

---

[9]The comparable provisions in the PMPA are worded quite similarly but they do not expressly contain a "bona fide" requirement for the first refusal option. (15 U.S.C.A. § 2802(b)(2)(E)(iii)(I), (b)(3)(D)(iii)(I)(II).)

In instructing the jury in this case on whether the offers tendered by Unocal approached fair market value under an objectively reasonable analysis, the trial court should instruct using the following four principles:

(1)  Fair market value, by definition, is the highest price a willing buyer would pay. (*Slatky, supra,* 830 F.2d at p. 484; *Arnold, supra,* 872 F.Supp. at p. 1500.) "The fair market value of any one property is a flexible concept, however: '[T]here is no universally infallible index of fair market value.' . . . A range of prices may reasonably claim to be the fair market value. As such, an offer is bona fide if it merely approaches fair market value under an objectively reasonable analysis [—assuming that all of the conditions of sale are reasonable]. Furthermore, in determining the fair market value of a property, no one valuation method is required. . . . ('There are many acceptable ways to appraise property.'). The facts of each individual case should set the terms of what constitutes a bona fide offer. . . . [¶] . . . As such, an analysis of [the] valuation methods is necessary." (*Arnold, supra,* 872 F.Supp. at p. 1500, citations omitted; *Slatky, supra,* 830 F.2d at p. 485, fn. 7.);

(2)  Under section 20999.25(a), the bona fide offer is of the franchisor's interest in the marketing premises. " 'Marketing premises' means . . . premises which . . . are to be employed by the franchisee in connection with the sale, consignment, or distribution of fuel." (Bus. & Prof. Code, § 20999, subd. (h).) Thus, a bona fide offer includes the sale of pumps, dispensers, storage tanks, piping and other equipment necessary for the continued operation of a service station. (*Ellis, supra,* 969 F.2d at p. 787; *Roberts* v. *Amoco Oil Co.* (1984) 740 F.2d 602, 606-607; *Gooley* v. *Mobil Oil Corp.* (D.Mass. 1987) 678 F.Supp. 939, 942) Section 20999.25(a), like the PMPA, allows franchisees a reasonable opportunity to continue operating their facilities if they exercise their right to buy. (*Ellis, supra,* 969 F.2d 784; *Ballis* v. *Mobil Oil Corp.* (D.C.Ill. 1985) 622 F.Supp. 473, 475 (*Ballis*).);

(3)  In the sale of a nationwide network of truckstops, more is "being offered for sale" than just the individual station and its operative equipment. (See *Ellis, supra,* 969 F.2d at p. 788.) "[B]idders routinely come to the table with different hands." (*Keener, supra,* 32 F.3d at p. 132.) A prospective third party buyer of several stations, like National, may have preexisting or planned commercial relationships that give it certain advantages in acquiring a franchise on a particular site. (*Ibid.*) This doesn't make that third party's offer for the particular site any less bona fide, so long as that offer is an actual one that approaches fair market value under an objectively reasonable analysis;

and (4)  "An actual price, agreed to by a willing buyer and a willing seller, is the most accurate gauge of the value the market places on a good."

(*Keener, supra,* 32 F.3d at p. 132.) That price is a measure of what the station is worth to a purchaser in National's position. (*Ibid.* [in *Keener,* for example, the franchisor set a minimum acceptable price for the station of $547,000; a third party's purchase offer of $1.2 million was implicitly deemed bona fide because the third party, a distributor, was able to buy cheaper gasoline that enabled it to bid a higher amount and still turn a profit at the high volume station]; see also *Ballis, supra,* 622 F.Supp. at p. 476 [under the PMPA, requiring a franchisor to eschew an actual higher offer from a third party in order to fulfill an offer from a franchisee is unrealistic].) Thus, the strategic value of Forty-Niner and Mid-Cal to the nationwide network of Unocal-branded truck stops that National was purchasing is a valid factor to consider in determining the fair market value of Forty-Niner and Mid-Cal to National, and therefore whether "bona fide offers" for those two truck stops were forwarded for purposes of section 20999.25(a).[10]

Defining a "bona fide offer" in section 20999.25(a) as one that approaches fair market value under an objectively reasonable analysis has several advantages. An objective fair market value standard protects the franchisee when his or her station is being sold and the franchise is being assigned to another. (See *Ellis, supra,* 969 F.2d at p. 788.) This standard also permits the franchisor to recover the fair market value of its property. (*Ibid.*) This standard is consistent with the prevalent federal view. (*Id.* at p. 787.) This makes for easier application and promotes economic predictability. The PMPA envisions nationwide uniformity in the termination or nonrenewal of franchises. (*California Arco Distributors, Inc.* v. *Atlantic Richfield Co., supra,* 158 Cal.App.3d at p. 362; *Ervin* v. *Amoco Oil Co., supra,* 885 P.2d at p. 256.) Adopting the prevalent federal view for section 20999.25(a) carries this uniform vision to the station sale context where the franchise is being assigned (or not ended in some other fashion). Since section 20999.25(a) applies to sales where franchises are not ending, it also ensures that a continuing franchisee is not afforded more protection than an ending one. Finally, it keeps the judiciary in its proper minimal role rather than micromanaging private economic decisions. (*Keener, supra,* 32 F.3d at p. 130; *Sandlin, supra,* 900 F.2d at p. 1481; *Arnold, supra,* 872 F.Supp. at p. 1498.)

At oral argument, National and Unocal stressed that the term "bona fide offer" in section 20999.25(a) should mean simply an offer that is not a sham offer. They pointed to their separately enforceable individual purchase contracts for the California truck stops and argued that since those agreements were "real" and not sham ones, they satisfied the bona fide offer requirement. There are two related problems with this approach: It makes the

---

[10]Section 2806(a)(2) of the PMPA specifies, however, that no state may adopt, enforce, or continue in effect any provision of law that requires a payment for the goodwill of a franchisee.

standard for determining "bona fide offer" a subjective rather than an objective one; and it makes the purchase contract *the* determinative factor as a matter of law instead of *a* factor in an objective analysis.

We conclude that an offer is bona fide under section 20999.25(a) if it approaches fair market value under an objectively reasonable analysis (assuming that all of the conditions of sale are reasonable—see *Slatky, supra,* 830 F.2d at p. 485, fn. 7).[11]

d., e.*

. . . . . . . . . . . . . . . . . . . . . . . . . .

2.-10.*

. . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

That part of the judgment granting a nonsuit to National and Clipper on the plaintiffs' civil conspiracy count is reversed. In all other respects, the judgment and postjudgment orders are affirmed. Each party shall pay its own costs.

Sims, Acting P. J., and Sparks, J.,† concurred.

A petition for a rehearing was denied November 18, 1997, and the petition of appellants Union Oil Company of California et al. for review by the Supreme Court was denied February 18, 1998.

---

[11]Section 20999.25(a) sets forth the bona fide offer/first refusal duty when a franchisor owns the service station premises and wants to sell its interest in those premises. Business and Professions Code section 20999.25, subdivision (b) (§ 20999.25(b)) sets forth a similar duty when a franchisor leases the service station premises but owns improvements thereon and is selling those improvements. In 1985, section 20999.25(b) was amended to limit the amount of a "bona fide offer" to fair market value or book value, whichever is greater. ("Book value" is defined as "actual cost less actual depreciation taken.")

The section 20999.25(b) amendment recognizes the equivalence of fair market value and bona fide offer. Although section 20999.25(a) was not similarly amended, that does not detract from our conclusion. Section 20999.25(b) was amended in 1985, just after the initial federal decisions equating fair market value and bona fide offer. Section 20999.25(b) concerns only the sale of improvements, a context in which "book value" may have great relevance. To add the concept of "book value" to section 20999.25(a) would sow confusion and inconsistency and reap little in return. The legislative history of this section 20999.25(b) amendment shows that some major oil companies were escalating the price of the improvements *to a price higher than fair market value or book value.* (Assem. Com. on Finance and Insurance, Assem. Bill No. 932 (1985-1986 Reg. Sess.), Background Information Request.)

*See footnote 1, *ante,* page 1261.

†Retired Associate Justice of the Court of Appeal, Third District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.