Filed 4/28/21  O'Connor v. Parille CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THOMAS O'CONNOR,<br><br>        Appellant,<br><br>    v.<br><br>KELLI PARILLE,<br><br>        Respondent. | B303967<br><br>(Los Angeles County<br>Super. Ct. No. BP142283) |

APPEAL from a judgment of the Superior Court of Los Angeles County, David J. Cowan, Judge.  Reversed.

Law Office of Sohaila Sagheb, Sohaila Sagheb for Appellant.

Bryan Cave Leighton Paisner, Edward M. Rosenfeld and Timothy L. Hayes for Respondent.

————————————————

Thomas O'Connor and Kelli Parille, the beneficiaries of a family trust, agreed to divide the proceeds from a transaction disposing of the trust's interest in a restaurant business. The agreement called for them to divide the proceeds equally, up to a certain amount, with Parille receiving any proceeds exceeding that amount. Ultimately the business was sold in a transaction that valued three distinct business assets. The proceeds exceeded the threshold amount, leading to a dispute over which of the component assets were included in the parties' agreement. The trustee proposed to distribute the proceeds from all three assets, in effect divesting O'Connor of half of the value of the third asset. O'Connor objected to the distribution, and Parille moved to enforce it pursuant to Code of Civil Procedure section 664.6. The trial court granted the motion, and O'Connor appeals.

We conclude the parties agreed to distribute proceeds only from two trust assets, not three. We therefore reverse.

## BACKGROUND

On June 27, 1990, William and Betty Lou O'Connor created the O'Connor Family Trust, naming their three children, Thomas O'Connor, Kelli Parille, and William Kevin (Chip), as residual beneficiaries. William O'Connor died in 1994 and Chip in 2004. The trustee was Jason Rubin.[1]

The O'Connor Family Trust owned a 56 percent interest in Calvir Burger, Inc., a Virginia Corporation that owned and operated two struggling restaurants. The remaining 44 percent was owned by Dale Town, who is not a party to this appeal. The

---

[1] On August 1, 2006, Betty Lou O'Connor created the Betty Lou O'Connor Trust, with Thomas O'Connor, Parille, and Chip's two children the equal residual beneficiaries. Betty Lou O'Connor died in 2012.

trust was also the landlord for the properties on which the restaurants were located.  The restaurants were in arrears on the rent.

Town had made several offers to purchase the trust's interest in Calvir Burger.  The cover letters to two such offers appear in the record.  The first cover letter, dated September 19, 2018, described multiple tabs appended to the letter.  Tab I, as described in the cover letter, "identifies the [trust's] 56% share of the business value of CALVIR Burger I, Inc[.] under [one of several proposed] lease options at various multiples of EBITDA[2], the arrears rent due from each store under that option, and the offer to purchase the [trust's] 56% share of CALVIR Burger I, Inc[.] for $795,746 using a multiple of 5 times EBITDA."  (Bold and underlining omitted.)

The second cover letter, dated March 6, 2019, also described multiple tabs, including Tab L, which "provides [a] summary of my offer to purchase the [trust's] 56% share of CALVIR Burger I, Inc[.] under [one of several proposed lease options] at a multiple of 5 times EBITDA in the amount of $555,537 plus the arrears rent due under that option as of December 31, 2018 of $113,086 [for one restaurant] and $11,231 for [the other restaurant]."

The record does not contain any tabs or other attachments to the two cover letters.

Following the deaths of their parents, O'Connor and Parille engaged in extensive litigation over the distribution of the assets

---

[2] EBITDA is an acronym for "earnings before interest, taxes, depreciation, and amortization."  (*Forty-Niner Truck Plaza, Inc. v. Union Oil Co.* (1997) 58 Cal.App.4th 1261, 1269.)

3

in the trust.[3] In September 2019, the parties participated in a mandatory settlement conference overseen by Judge Cowan, who also was the trial judge. As part of a larger settlement agreement, O'Connor and Parille agreed on the record that Rubin would sell the O'Connor Family Trust's 56 percent interest in Calvir Burger to Town for at least $851,000, which Rubin had represented was the low fair market value. (The fair market value would increase to $996,800 were certain conditions met.)

The agreement provided: "[R]ubin, if he can, will negotiate a transaction with Dale Town providing for the redemption or sale of [the trust's] 56 percent interest in Calvir Burger One for the best available price but not less than $851,000 and thereafter will distribute the net proceeds of the transaction as follows: $150,000 will be distributed to each of [Parille] and [O'Connor] for a total of $300,000. The remaining net proceeds will be divided . . . equally between [O'Connor] and [Parille] up to $551,000. All remaining proceeds from the Calvir Burger sales transaction to [Parille]."

In other words, the agreement provided that O'Connor and Parille would share the proceeds of the transaction equally up to $851,000, with Parille receiving anything over that amount.

The reason for the specific provision governing distribution of $300,000 of the $851,000 total was explained by the parties in a colloquy with the trial court earlier in the day, before the parties entered the above terms on the record. In that colloquy, O'Connor's counsel stated that Calvir Burger had "retained earnings" in excess of $500,000, of which $300,000 should be

---

[3] Chip's children were also parties to the litigation, but their claims are not at issue in this appeal.

4

distributed to O'Connor and Parille equally. Parille's counsel agreed "there will be a distribution of $300,000" of which his client would receive a one-half share.[4]

Rubin sold Calvir Burger to Town in a packaged transaction that included settlement of Calvir Burger's rent and cash withholding obligations to the O'Connor Family Trust, obtaining $1,034,000. In an email, Town explained his understanding of the breakdown of the purchase price: $594,721 for corporation stock, $139,215 in back rent for the first restaurant, $14,847 in back rent for the second restaurant, and $286,051 as a "56% distribution of cash withholdings after lease arrears."

Rubin proposed to distribute the $1,034,000 by giving $608,500 to Parille and $425,500 (half of $851,000) to O'Connor.

O'Connor objected to the distribution, contending only $851,000 had been derived from the sale of Calvir Burger, the remaining $183,000 constituting proceeds from payment of the back rent. O'Connor contended that the settlement agreement did not address distribution of the back rent. Therefore, O'Connor argued, Parille should receive half of the $851,000 sales proceeds, or $425,500, as agreed, and half—not all—of the $183,000 rent settlement proceeds, or $91,500, for a total of only $517,000, a difference of $91,500.

---

[4] On appeal, the parties dispute whether to characterize the $300,000 as "retained earnings" or "cash on hand." For purposes of this appeal only, we refer to the $300,000 as representing a distribution of Calvir Burger's cash account. In so doing, we do not purport to determine how in fact that sum should be characterized, an issue not relevant to our resolution of this appeal.

Parille filed a motion to enforce the settlement agreement in such a manner as to confirm Rubin's proposed distribution.

At the hearing on the motion, the court, Judge Cowan again presiding, found that O'Connor's contention that the back rent was not part of the proceeds covered by the settlement "would not seem credible to me [in] that it appeared to have been a total package, that Mr. Town['s] earlier offers to buy the business appeared to be inclusive of the [unpaid] rent . . . . Valuation of the amount that [Town] was willing to pay would seem to include what he was now going to have to pay of [rent] that had not previously been paid."

The court found that Rubin "include[ed] as part of the [sales] package that there be releases in connection with past amounts due," but acknowledged "there's nothing in the settlement agreement specifically on this issue other than the general terms." The court nevertheless found in its written order that "[b]ased on the plain meaning rule and the parties' unambiguous on the record agreement," the parties agreed that " 'the net proceeds of the transaction' " would be divided equally up to $851,000, "after which 'all remaining proceeds from the Calvir Burger sales transaction' would go 'to [Parille].' " The court found this meant that the trustee would "distribute the proceeds of the transaction with Dale Town over and above $851,000 to [Parille]," including proceeds from settling the rent arrearage. The court therefore granted Parille's motion.

O'Connor appeals.

## DISCUSSION

O'Connor contends the trial court erred by finding the parties' agreement extended to the rent settlement. We agree.

6

Code of Civil Procedure section 664.6 (section 664.6) provides: "If parties to pending litigation stipulate, in a writing signed by the parties outside the presence of the court or orally before the court, for settlement of the case, or part thereof, the court, upon motion, may enter judgment pursuant to the terms of the settlement."

There is a strong public policy in favor of the voluntary settlement of litigation. (*Osumi v. Sutton* (2007) 151 Cal.App.4th 1355, 1359.) Accordingly, in reviewing a court's approval of a settlement, "[c]onsistent with the venerable substantial evidence standard of review, and with our policy favoring settlements, we resolve all evidentiary conflicts and draw all reasonable inferences to support the trial court's finding that the[ ] parties entered into an enforceable settlement agreement . . . ." (*Id*. at p. 1360.) However, when the facts are undisputed and the only question is a matter of law, our review is de novo. (*County of Yolo v. Los Rios Community College Dist*. (1992) 5 Cal.App.4th 1242, 1248.)

The only issue in this appeal is one of contract interpretation: Whether the parties agreed that the proceeds of this transaction would be distributed as Rubin proposed, that is, that the proceeds would include the back rent.

"The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties. (Civ. Code, § 1636.) If contractual language is clear and explicit, it governs. (Civ. Code, § 1638.) On the other hand, '[i]f the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it.' " (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264-1265.) A

7

court faced with an argument that contract language is ambiguous must interpret the language in context. (*Id.* at p. 1265.) "This is because '*language in a contract* must be construed in the context of that instrument as a whole, and in the circumstances of that case, and *cannot be found to be ambiguous in the abstract.*'" (*Ibid.*)

A judgment that does not properly reflect material terms of a settlement defeats the purposes of the settlement and violates section 664.6, and must be reversed. (*Machado v. Myers* (2019) 39 Cal.App.5th 779, 794.)

Here, the parties agreed that Rubin would negotiate "a transaction" with Town "for the redemption or sale" of Calvir Burger, and would distribute the net proceeds of "the transaction" equally to Parille and O'Connor up to $851,000, with remaining proceeds from the "sales transaction" going to Parille.

On its face, "sales transaction" arguably would seem to refer only to a sale, i.e., the sale by which the trust's interest in Calvir Burger would be conveyed to Town.

Sales of businesses, however, can be complex and involve multiple transactions, not all of which necessarily involve the transfer of ownership of the business itself. The sales transaction contemplated by the settlement agreement is no exception. As discussed, the parties agreed at settlement that $300,000 of the "sale" price was not for the conveyance of Calvir Burger itself, but was a distribution of the corporation's cash withholdings to the trust. In that context, the phrase "sales transaction" means not the transaction *by* which Calvir will be conveyed to Town but *in* which it will be conveyed, along with something else, namely settlement of the corporation's cash account. In context, therefore, the sale of Calvir Burger to Town occurred as part of a

package deal, the proceeds of which would be distributed to Parille and O'Connor equally.

The issue is whether the parties' agreement contemplated that an additional trust asset, Calvir Burger's obligation for overdue rent, would be made part of the Calvir Burger "sales transaction." No evidence of which we have been apprized supports such an addition. Nothing in the language of the settlement agreement refers to the overdue rent, and in fact the trial court expressly found that although Rubin had made release of past rents "part of the [sales] package," there was "nothing in the settlement agreement specifically on this issue."

The settlement agreement's silence on the issue of back rent is particularly notable given that the agreement expressly addressed a component of the transaction other than the sale itself, namely the distribution of the corporation's cash account. The fact that the parties' agreement expressly contemplated and addressed this additional component strongly suggests the parties did not intend the term "proceeds" as a catch-all for all monies exchanged in the transaction, and instead intended to provide for the distribution of each component separately. Having expressly provided for distribution of the cash account, while remaining silent on the issue of back rent, we must conclude the parties did not intend the settlement agreement to cover distribution of the back rent.

In reaching the opposite conclusion, the trial court relied on Town's "earlier offers to buy the business," which to the court "appeared to be inclusive of the [unpaid] rent." As we have noted, that evidence was limited to cover letters briefly summarizing offer terms, with none of the supporting documentation fleshing out the specifics of those offers. There is no indication that those

9

offers addressed or included distribution of Calvir Burger's cash account, an issue central to the settlement agreement at issue in this case. This limited evidence provided an insufficient basis to draw conclusions about the structure of the parties' earlier dealings and how they might compare to the transaction contemplated by the settlement agreement.

We acknowledge that when, as here, "the same judge presides over both the settlement and the section 664.6 hearing, he may avail himself of the benefit of his own recollection" to determine whether the parties have validly settled an issue. (*Kohn v. Jaymar-Ruby, Inc.* (1994) 23 Cal.App.4th 1530, 1533.) In the instant case, however, the trial judge did not indicate that he was relying on his own recollection when ruling on the enforcement motion, so this principle does not apply.

The trial court therefore erred in finding that the settlement agreement encompassed distribution of proceeds derived from any trust asset other than the 56 percent interest in Calvir Burger itself and the additional $300,000 expressly earmarked by the parties. We do not hold that the parties excluded rent arrearages from the Calvir Burger transaction, only that the settlement agreement said nothing about distributing proceeds derived from resolving the arrearages. We express no opinion as to what portion of the money the trust received for the transaction constituted payment for the arrearages.

Parille argues that O'Connor made a "judicial admission" in his opposition to her settlement enforcement motion to the effect that he approved of the Calvir Burger sale including settlement of the corporation's rent obligation, which estops him from now arguing against distribution of the transaction proceeds. We

10

disagree. Aside from it being impossible to make a judicial admission in an unsuccessful opposition to a motion, even had O'Connor approved the transaction, no evidence indicated he approved distribution of the proceeds pursuant to the settlement agreement.

Parille raises several other arguments having to do with classification of Calvir Burger's cash reserves, the corporation's fair market value, Rubin's neutrality, the merits of the Calvir Burger transaction, and O'Connor's failure to "address" or "come to grips" with several tangential factors. Given our conclusion as discussed above, we need not address these immaterial matters.

## DISPOSITION

The judgment is reversed. Respondent's motion for sanctions is denied. Appellant is to receive costs on appeal.

NOT TO BE PUBLISHED

CHANEY, J.

We concur:

BENDIX, Acting P. J.

FEDERMAN, J.*

---

\* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.